**Leroy GLOVER, Jr., Plaintiff,**

v.

**NMC HOMECARE, INC., Defendant.**

**No. 98–2477–JTM.**

United States District Court,
D. Kansas.

July 11, 2000.

Charles W. Fairchild, Fairchild, Stang, Beal, Barber & Sanders, Kansas City, MO, Douglas B. Breyfogle, Kansas City, MO, for plaintiff.

Paul F. Pautler, Jr., Blackwell Sanders Peper Martin, LLP, Kansas City, MO, for defendant.

*MEMORANDUM AND ORDER*

MARTEN, District Judge.

This matter is before the court on NMC Homecare, Inc.'s ("NMC") motion for summary judgment. The motion seeks summary judgment on all of plaintiff's claims, which include race discrimination under Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981; disability discrimination under the Americans with Disabilities Act (ADA); hostile work environment sexual harassment under Title VII; and state law claims for whistleblower retaliatory discharge and intentional infliction of emotional distress. The court has carefully reviewed and considered the parties' arguments and is prepared to rule. For the reasons set forth below, the defendant's motion for summary judgment is granted.

## I. Facts

The following facts are either uncontroverted [1] or viewed in the light most favorable to plaintiff, the nonmoving party. Plaintiff, an African–American male, began employment at NMC's Kansas Billing Center in Lenexa as a Team Leader on September 3, 1996. NMC was a provider of homecare services, infusion services, durable medical equipment and prescription medications, including Intra–Dialytic Parenteral Nutrition ("IDPN"), a nutrition supplement for individuals with end stage renal disease ("ESRD"). At the time plaintiff began employment, NMC's corporate headquarters were in Waltham, Massachusetts, a suburb of Boston. NMC had five Renal Support Center locations— Merriam, Kansas; Anaheim, California; Charlotte, North Carolina; Houston, Texas; and Monroe, Louisiana. The Renal Support Centers accepted call-ins for prescription medications; verified insurance information; completed certain portions of appropriate paperwork; and mixed the prescriptions. The Kansas Billing Center billed and collected for the services provided by the NMC Homecare Renal Support Centers.

Judy Allen, Medicare Reimbursement Manager, and Vickie Sanders, Billing Center Manager, interviewed plaintiff and hired him into the position of Team Leader beginning in September 1996 at an annual salary of $30,000. Judy Allen was plaintiff's direct supervisor throughout his employment with NMC. At the time plaintiff was hired, there were two billing teams, each headed by a Team Leader. Plaintiff, as one of two Team Leaders, supervised one team. Sheila Sarratt, a white female, supervised the other team. At that time, the teams were organized based on the therapies billed—one team billing for IDPN Therapy and the other team billing for Homecare Services.[2]

1. Plaintiff has admitted to the vast majority of the defendant's uncontroverted facts by failing to address them as required by D.Kan. Rule 56.1, which states: "All material facts set forth in the statement of the movant shall be deemed admitted for the purpose of summary judgment unless specifically controverted by the statement of the opposing party."

2. Following corporate changes in late spring/early summer 1997, the teams were

When plaintiff was hired, his scheduled hours of work were 8:00 a.m. through 5:00 p.m. On October 9, 1996, less than a month after plaintiff began employment, Judy Allen met with plaintiff to clarify the expectation that he was to have a set time to begin each workday.[3] Plaintiff agreed to be at work at 8:30 a.m. and to continue to use a time card. Judy Allen addressed several other expectations during the October 9, 1996, meeting with plaintiff, including the requirement that he, as a Team Leader, always have coverage in his department.[4] In addition, Judy Allen advised plaintiff it was inappropriate and a terminable offense for plaintiff to reveal the salaries of his team members.[5]

In early November 1996, approximately two months after plaintiff began as a Team Leader, a female employee, Jean Jones, supervised by plaintiff, complained to Judy Allen that plaintiff had made an inappropriate reference about Mrs. Jones's age and that plaintiff made other comments that made her uncomfortable. Judy Allen informed plaintiff of the complaint by Jones and advised him it was not appropriate to make such references or comments to employees. Plaintiff responded that he had made the comments in a joking way.

In the Fall of 1996, following corporate organizational changes in NMC's parent company, NMC came under the management of Fresenius Medical Care of North America ("FMCNA"). Under FMCNA's management, NMC separated IDPN therapy from the other homecare services provided. Thereafter, the divisions operated separately as the IDPN Division and the Homecare Division.

In April 1997, NMC promoted Dr. Lisbeth Schwebke to the position of IDPN Director of Operations, responsible for the Renal Support Centers. In May 1997,

Judy Allen moved into the position of Kansas Billing Center Manager, reporting to Chip Roy, the Director of Finance. Plaintiff continued to report directly to Judy Allen.

Payment for IDPN Therapy for patients under the Medicare program is governed by strict guidelines promulgated by the Health Care Finance Administration ("HCFA"). A Certificate of Medical Necessity ("CMN") is a form created by HCFA that describes a patient's medical condition. NMC Renal Support Centers completed certain portions of CMNs for services provided. Verification of the validity and accuracy of the CMNs was part of plaintiff's job responsibilities.

In June 1997, NMC's IDPN Director, Dr. Schwebke, became aware of a potential problem with the completion of CMNs originating in the Charlotte, North Carolina Renal Support Center. Dr. Schwebke immediately called the Corporate Compliance Department to report the potential problem and to determine the action she should take. Dr. Schwebke went to the Charlotte branch to look into the situation; a Corporate Compliance Team was also sent to Charlotte to conduct interviews and an audit. In the Summer of 1997, NMC conducted an investigation related to altered CMNs out of the Charlotte, North Carolina branch office.

Prior to August 1997, Chip Roy, Judy Allen's superior, requested Billing Center Manager Judy Allen and those she supervised to hold all claims for the Charlotte branch because the corporate office was looking into problems that may have occurred in the Charlotte branch.

In late July 1997, Judy Allen was out of the office on vacation for two days (a Fri-

---

organized based on the two separate billing systems used by the Kansas Billing Center at the time, one team using MESTA and the other using System 36.

**3.** Although plaintiff had been told his start time was 8:00 a.m., he had been coming in later than 8:00 a.m.

**4.** Vickie Sanders informed Allen that there had been an occasion the week before when she went to plaintiff's department and no one was there to answer the telephones.

**5.** Judy Allen had previously received a report that plaintiff revealed the salary of a team member to other team members.

day and the next Monday). During the days Judy Allen was on vacation, plaintiff notified a number of individuals in the Homecare Division (not plaintiff's Division) that he had discovered some potential problems with CMNs completed in the Charlotte, North Carolina branch.[6] Consequently, the head of the Homecare Division (Frank Doetzl) learned of the discovery before the head of the IDPN Division (Chip Roy) learned of the discovery in his own Division.

Plaintiff was not criticized or disciplined for bringing potential problems with the CMNs to the company's attention. Judy Allen, however, did express disapproval with plaintiff for communicating the information relating to the CMNs outside of his chain of command, rather than through the proper channels because Frank Doetzl found out about the CMNs before Chip Roy (Allen's supervisor). She told plaintiff that Chip Roy was upset because he found out about the CMN problems after Frank Doetzl. It is plaintiff's understanding Chip Roy "got in some type of heat" because he did not know about plaintiff's discovery of problems with the CMNs until after Frank Doetzl did.

In early September 1997, a female temporary employee in the Kansas Billing Center contacted NMC's Corporate Human Resources Department ("HR"), located in Lexington, Massachusetts, complaining plaintiff made inappropriate remarks to her and expressing that she felt uncomfortable being alone with him and did not want to work off site with plaintiff alone. A Corporate HR employee, Arlene Turransky, contacted Judy Allen regarding the complaint of sexual harassment made by a female employee related to plaintiff. Turransky did not provide Allen with the name of the complainant, or with the alleged remarks or where or when the incident had occurred. She instructed Allen

to investigate the complaint. At Turransky's direction, Judy Allen placed plaintiff on one day paid leave while she investigated the complaint. Plaintiff denied the allegations, and the investigation was ultimately deemed inconclusive.

Plaintiff received his first annual performance review September 24, 1997. Plaintiff's supervisor, Judy Allen, completed the evaluation. Overall, Allen rated plaintiff's performance as "Meets Expectations." On his evaluation, plaintiff received a deficient performance rating ("Needs Improvement") in the area of "Dependability" based on his need to improve in the areas of arriving on time to work and to meetings. Overall, plaintiff thought his evaluation was pretty good.

In August 1997, Dr. Schwebke, NMC's IDPN Director of Operations, assumed responsibility for the Kansas Billing Center where plaintiff was employed. Consequently, Judy Allen began reporting to Dr. Schwebke in August 1997. On or about August 11, 1997, Dr. Schwebke traveled to the Kansas Billing Center to familiarize herself with the organizational structure and the role of the staff at the Billing Center. After assuming responsibility for the Kansas Billing Center and beginning to understand how it worked, Dr. Schwebke formed ideas about reorganizing the Billing Center so that each team would be responsible for billing and be accountable to a separate Renal Support Center. Dr. Schwebke discussed her ideas for restructuring the Billing Center with manager Judy Allen. Dr. Schwebke indicated to Judy Allen that she wanted the teams structured differently so that each of the three Renal Support Centers[7] would have a specific contact at the Kansas Billing Center when they needed assistance from the Billing Center.

---

**6.** Dr. Schwebke was not aware of any involvement of plaintiff in reporting any problems with CMNs at any time during plaintiff's employment. Plaintiff was not the individual who reported alleged problems to Dr. Schwebke in June 1997.

**7.** By June 1997, three NMC Renal Support Centers remained—Merriam, Anaheim and Charlotte.

In approximately August or September 1997, NMC hired Randy Turpin into the position of Financial Services Manager based out of St. Petersburg, Florida. Turpin reported directly to Dr. Schwebke. Turpin did not have supervisory authority over any employees; no employees reported to Turpin and he did not have the power to hire or fire any NMC employees. Turpin's job duties included conducting training at the three Renal Support Centers and at the Kansas Billing Center. The training included job-skill training, such as effective time management, for employees. Turpin also acted as a communication liaison between the Renal Support Centers and the Kansas Billing Center.

As an assessment tool to aid him in his recently assigned duties, Turpin prepared a survey in early Fall 1997 to gather information from the staff at the Kansas Billing Center regarding their job duties, the training they had received to prepare them for such duties, the efficacy of prior training received, and identification of areas in which additional training was needed. Turpin distributed the surveys to Kansas Billing Center staff on September 22, 1997. The staff completed the surveys and returned them to Turpin for analysis. of training needs. The surveys indicated employees did not feel they received adequate training to perform their jobs, were not satisfied with the team structure and had significant dissatisfaction with both Team Leaders-plaintiff and Sheila Sarratt. After reviewing the surveys, Turpin summarized the results in a memorandum to Dr. Schwebke dated October 2, 1997, and identified several steps for improvement. The recommended actions set forth by Turpin focused on preservation of the existing team structure, including Team Leaders, with a plan for improving the training standards and setting goals for Team Leaders to meet. Turpin's recommendations did not involve reorganizing or restructuring the Billing Center and did not involve eliminating the Team Leader positions.

In November 1997, the Kansas Billing Center was reorganized around a market-centered concept, dividing the Patient Account Representatives ("Collectors") into three "teams," each team assigned to bill and collect for a particular Renal Support Center. Both former Team Leader positions were eliminated in the reorganization. Neither Sheila Sarratt nor plaintiff, the two former Team Leaders, supervised any employees after the reorganization. Individuals who previously reported to the former Team Leaders all reported directly to Judy Allen after the reorganization. Turpin did not make recommendations or proposals concerning restructuring the Kansas Billing Center and was not responsible for the new structure into which the Center was organized. At most, he helped implement the new organization that was coordinated by Schwebke and Allen.

Judy Allen, with Dr. Schwebke's approval, assigned plaintiff to the newly created position of Critical Accounts Specialist in the reorganization. They felt plaintiff was suited for this position because of his past experience and success working critical/difficult accounts. Plaintiff's pay and benefits did not change when he was assigned to the position of Critical Accounts Specialist. The other former Team Leader, Sheila Sarratt, was assigned to the newly created position of Senior Patient Account Representative.

NMC considered plaintiff's new assignment and Sheila Sarratt's assignment lateral moves. Plaintiff, on the other hand, considered the transfer a demotion, because he no longer supervised employees, he claims he was isolated from the other employees, and he eventually shared the same job responsibilities with the employees he formerly supervised. Plaintiff claims that by performing the Critical Account Specialist's duties, he would have eventually settled, collected or resolved all delinquent accounts and worked himself out of a job, a speculation NMC regards as "nonsensical."

During the first week of December 1997, plaintiff reported to Roberta Norman, Clinical Reimbursement Manager, that he had been sexually harassed by Randy Turpin. Norman notified Dr. Schwebke of plaintiff's complaint. Plaintiff was aware of NMC's sexual harassment complaint procedures and knew NMC did not condone sexual harassment. On December 2, 1997, upon learning of plaintiff's complaint, Dr. Schwebke immediately involved Corporate HR. Corporate HR directed Dr. Schwebke to meet with plaintiff regarding his complaint. Dr. Schwebke reported to Corporate HR that she had a conference call with plaintiff later on December 2, 1997. At Dr. Schwebke's request, plaintiff's supervisor Judy Allen sat in on the conference call as well. At the direction of Corporate HR, Dr. Schwebke requested plaintiff to document his allegations in writing to the best of his recollection, which he did. Plaintiff provided the written accounts on December 4 and December 5, 1997. Dr. Schwebke forwarded plaintiff's written accounts to Corporate HR for use in its investigation.

According to plaintiff, the alleged harassment occurred when plaintiff went to Turpin's hotel room on two separate occasions in August and September 1997. Plaintiff claimed Turpin had come on to him and made sexually suggestive remarks. Plaintiff claimed during one visit Turpin watched plaintiff go to the bathroom when plaintiff left the bathroom door open. At Corporate HR's request, Dr. Schwebke provided receipts and expense reports documenting Turpin's hotel and room number and other details. On December 9, 1997, Lynn Parr, Corporate HR Employee Relations Representative, and Tracey Mayall, Corporate HR Employee Relations Supervisor, interviewed Turpin about plaintiff's harassment allegations. In the interview, Mayall asked Turpin numerous questions based on plaintiff's written account of the allegations. Turpin denied plaintiff's allegations of harassment.

On December 10, 1997, Mayall called Shari Hobsgood, another NMC employee, because plaintiff claimed he had overheard a telephone call between Turpin and Hobsgood while plaintiff was in Turpin's hotel room. The conversation plaintiff claimed to have overheard allegedly dealt with Hobsgood's swimming pool and about planning a party. Hobsgood indicated she had not had a conversation with Turpin from his hotel room and that she did not have a swimming pool.

In its investigation, Corporate HR considered information including accounts of the alleged incidents of harassment plaintiff provided to Dr. Schwebke; the interview with Turpin; the interview with Hobsgood; and information provided by Dr. Schwebke relating to dates Turpin traveled to Kansas City and his activities while there. After considering the information gathered in the investigation and concluding there were no additional witnesses to interview, Corporate HR determined the investigation "inconclusive" and notified plaintiff and Turpin in separate letters of this result. Although the investigation was inconclusive, Turpin was instructed not to have any contact with plaintiff. Turpin did not have any verbal or physical contact with plaintiff after plaintiff made the harassment complaint.

Plaintiff was out of the office on medical leave from December 9, 1997 through December 18, 1997, when he was hospitalized for depression.[8] Upon discharge from the hospital, plaintiff's doctor observed plaintiff was fully able to function in society and his workplace and was fully able to perform the essential functions of his job. Plaintiff's doctor released him to return to full work without any limitations. Everything plaintiff's doctor provided to NMC indicated plaintiff was fully able to work without any limitations or accommodations. Plaintiff's doctor indicated (1) there were no essential functions of plaintiffs job

**8.** Plaintiff admitted himself to Two Rivers Psychiatric Hospital. He was initially admitted to the substance abuse unit because he was under the influence of cocaine when he arrived at the hospital.

plaintiff could not perform; (2) plaintiff could return to work full-time December 17, 1997; and (3) plaintiff had "no limitations" or recommended accommodations upon his return to work. Upon his return to work, plaintiff claims he was in denial that his depression continued. Plaintiff never requested an accommodation. In fact, plaintiff did not believe he needed an accommodation at work for his alleged disability. No one ever made disparaging remarks about plaintiff's mental or emotional condition at work. Major depression is the only disability plaintiff is claiming in this lawsuit.

On November 25, 1997, prior to plaintiff's allegations of sexual harassment and prior to plaintiff's hospitalization, Judy Allen documented a counseling session she had with plaintiff regarding a number of recent attendance and timeliness problems:

> He [plaintiff] was off the day before Thanksgiving on an unscheduled vacation day saying that he had personal problems. He was also sick on November 20 and didn't come in until 11:00 on the 21st saying that he had to be in court that morning. On the 14th he asked for a vacation day with only a couple days' notice and was off on sick leave for 40 hours October 23–31. He agreed to correct the problem.

Allen Dep. 98:1–20 and Ex. K.

On December 29, 1997, plaintiff sent a 2½ page single-spaced memo to NMC's Corporate HR, consisting primarily of detailed complaints about daily workplace issues, including complaints of other employees making personal phone calls; employees playing radios too loudly; and employees talking too loudly on the phone. In the memo, plaintiff also discussed the sexual harassment complaint that had been filed against him in early September 1997, more than three months earlier. On December 31, 1997, Dr. Schwebke (by telephone) and Judy Allen

met with plaintiff to discuss the issues raised in his December 29, 1997 memorandum.[9] During that meeting, the women clarified plaintiff's job duties and assured him of his importance in the goal of the department—collecting money. They also stressed the importance of communication. Schwebke documented the meeting in a memorandum to plaintiff dated December 31, 1997.

On January 8, 1998, plaintiff sent another memorandum to Dr. Schwebke (approximately 4 pages single-spaced) responding to Dr. Schwebke's memo documenting the December 31, 1997 meeting. On January 15, 1998, Dr. Schwebke and Judy Allen again met with plaintiff, this time to address a number of issues raised in plaintiff's January 8, 1998 memorandum from plaintiff to Dr. Schwebke. Corporate HR Employee Relations Supervisor, Tracey Mayall was present at the January 15, 1998 meeting as a mediator and witness. Plaintiff arrived fifteen minutes late to the January 15, 1998 meeting. During the meeting, one of the issues Dr. Schwebke discussed with plaintiff was his tardiness and absenteeism. Plaintiff acknowledged he had been tardy. During the meeting, Mayall asked plaintiff how he was going to avoid arriving late, and he responded that he would take care of it. Dr. Schwebke's memorandum documenting the January 15, 1998 meeting warned plaintiff that his tardiness had to stop or corrective action would be taken.

In March 1998, plaintiff clocked in after 9:00 a.m. (his adjusted start time) on nine separate occasions. On March 23, 1998, Allen again verbally counseled plaintiff regarding tardiness arriving to work and taking longer than the one hour permitted for lunch. On April 20, 1998, plaintiff's supervisor again counseled plaintiff because his timecard reflected ongoing tardiness. Specifically, plaintiff had clocked in after 9:00 a.m. on April 7, 8, 10 13, 15 and

---

9. At plaintiff's request, Roberta Norman, Clinical Reimbursement Manager, also attended the meeting.

20. In addition, plaintiff had failed to clock out for the day on April 10, 1998. On April 22, 1998, plaintiff was at lunch for longer than the one hour he was allowed.

On April 27, 1998, Allen gave plaintiff a written Final Warning for numerous performance and conduct issues, including unauthorized use of his supervisor's office in her absence; insubordinate behavior—giving out incorrect information to his supervisor's superior and a colleague; failing to perform his work as instructed; time violations; and use of the company fax to conduct personal business. The Final Warning Notice advised plaintiff he was on "final warning" status until July 27, 1998. On April 28, 1998, the very next day after being given the Final Warning, plaintiff was late returning from lunch. On April 30, 1998, plaintiff arrived to work late. Also on April 30, 1998, two employees reported to plaintiff's supervisor that they had seen plaintiff pulling other employees' timecards and photocopying them.

Judy Allen wrote and forwarded a memorandum to plaintiff on April 30, 1998 advising him that he had been late twice since receiving his Final Warning on April 27, 1998 and that he had been seen tampering with other employees' timecards, which was unacceptable. In that same memorandum, Allen warned plaintiff that he would not be given any more chances. Plaintiff again returned late from lunch on May 7, 1998 and on May 12, 1998. On May 12, 1998, Allen terminated plaintiff's employment with NMC because he had been late twice coming back from lunch in the same pay period after being warned twice in writing. Plaintiff has no evidence, other than his own belief, that other employees had similar attendance and tardiness problems, but were not disciplined.

## II. Summary Judgment Standards

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the court must examine all of the evidence in a light most favorable to the opposing party. *Jurasek v. Utah State Hosp.*, 158 F.3d 506, 510 (10th Cir. 1998). The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. *Baker v. Board of Regents*, 991 F.2d 628, 630 (10th Cir.1993). The moving party need not disprove the nonmoving party's claim or defense; it need only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir.1987).

Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting Fed.R.Civ.P. 56(e)) (emphasis in *Matsushita*). The opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the opposing party must come forward with significant admissible probative evidence supporting that party's allegations. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

## III. Race Discrimination

■ Plaintiff brings his race discrimination claims against the defendants under 42 U.S.C. § 1981 and 42 U.S.C. § 2000e–2(a) (Title VII). Plaintiff's race discrimi-

nation claims require an identical analysis. *Randolph v. Board of Pub. Utils.,* 983 F.Supp. 1008, 1013 (D.Kan.1997) (citing *Aramburu v. The Boeing Co.,* 112 F.3d 1398, 1403 n. 3 (10th Cir.1997) (Title VII, § 1981, and KAAD); *Randle v. City of Aurora,* 69 F.3d 441, 450 (10th Cir.1995) (Title VII, § 1981 and § 1983)).

■ Because plaintiff has failed to produce any direct evidence of intentional discrimination, he must demonstrate such intent indirectly by following the *McDonnell Douglas*[10] burden-shifting framework. *Thomas v. Denny's, Inc.,* 111 F.3d 1506, 1509 (10th Cir.1997).

■ Under the *McDonnell Douglas* framework, plaintiff has the initial burden of establishing a prima facie case of intentional discrimination. *Thomas,* 111 F.3d at 1509. If plaintiff meets his burden, the burden switches to the defendant to articulate a " 'legitimate, nondiscriminatory reason for the employee's rejection.' " *Id.* (quoting *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817). The defendant's burden is one of production, not persuasion; "it 'can involve no credibility assessment.' " *Reeves v. Sanderson Plumbing Prods., Inc.,* —— U.S. ——, 120 S.Ct. 2097, 2106, 147 L.Ed.2d 105 (2000) (quoting *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 509, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)). Once the defendant has set forth a facially nondiscriminatory explanation for its decision, "the factual inquiry proceeds to a new level of specificity." *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 255, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). The *McDonnell Douglas* framework—with its presumptions and burdens—disappears, and "the sole remaining issue [is] 'discrimination vel non.' " *Reeves,* 120 S.Ct. at 2106 (quoting *U.S. Postal Serv. Bd. of Governors v. Aikens,* 460 U.S. 711, 714, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983)). Plaintiff must be given an "opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defen-

dant were not its true reasons but were a pretext for discrimination." *Burdine,* 450 U.S. at 253, 101 S.Ct. 1089. "[A]lthough the presumption of discrimination 'drops out of the picture' once the defendant meets its burden of production, the trier of fact may still consider the evidence establishing the plaintiff's prima facie case 'and inferences properly drawn therefrom ... on the issue of whether the defendant's explanation is pretextual.' " *Reeves,* 120 S.Ct. at 2106 (quotations omitted).

■ To state a prima facie case of race discrimination, plaintiff must show: (1) that he is a member of a racial minority; (2) that he suffered an adverse employment action; and (3) that similarly situated non-minority employees were treated differently. *Trujillo v. University of Colo. Health Sciences Ctr.,* 157 F.3d 1211, 1212 (10th Cir.1998).

■ Plaintiff can satisfy the first element of his race discrimination claim—he is a member of a racial minority. With regard to the second element, plaintiff's termination qualifies as an adverse employment action. However, the elimination of his position as a team leader is a closer question. The Tenth Circuit liberally construes the phrase "adverse employment action." *Sanchez v. Denver Pub. Sch.,* 164 F.3d 527, 532 (10th Cir.1998). "Such actions are not simply limited to monetary losses in the form of wages or benefits." *Id.* Instead, the Tenth Circuit takes a "case-by-case" approach, examining the unique factors relevant to the situation before it. *Id.* However, " 'a mere inconvenience or an alteration of job responsibilities' " is not considered an adverse employment action. *Id.* (quoting *Crady v. Liberty Nat'l Bank & Trust Co.,* 993 F.2d 132, 136 (7th Cir.1993)); *see also Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 761, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) (finding that conduct is adverse

---

**10.** *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

employment action if it "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits"). The court will assume, without deciding, that the elimination of plaintiff's position as a team leader was an adverse employment action.

■ Although plaintiff has established the first two elements of his prima facie case of race discrimination, he is unable to satisfy the third element, i.e., that similarly situated non-minority employees were treated differently. With regard to the elimination of his team leader position, plaintiff admits that both team leader positions were eliminated in the reorganization of the Kansas Billing Center. Neither Sheila Sarratt, a white female, nor plaintiff supervised any employees after the reorganization. Therefore, plaintiff has not shown he was treated any differently than similarly situated employees.

Plaintiff claims that Sheila Sarratt was tardy as much or more than he was but that she was not terminated for her tardiness. To substantiate his claim, plaintiff has submitted the affidavit of Jammie Berg, an hourly, non-supervisory employee. However, plaintiff has not established Berg's competency to testify. Specifically, plaintiff has not shown that Berg has personal knowledge to testify about the comparative attendance/tardiness of plaintiff and Sheila Sarratt or the discipline each received. *See* Fed.R.Civ.P. 56(e) (requiring affidavits to be made on personal knowledge and to show that the affiant is competent to testify to the matters stated therein). Thus, plaintiff has not shown that similarly situated employees—i.e., those who have received two Final Warnings regarding tardiness but continue their pattern of being tardy—were not terminated. Therefore, he is unable to satisfy the third element of his prima facie case.

■ Even if one assumes, for argument sake, that plaintiff has established a prima facie case, the court concludes that plaintiff has failed to meet his burden of showing the existence of a genuine dispute of material fact as to whether the defendant's articulated reasons for eliminating his position as a team leader and his ultimate termination are pretextual. The elimination of the team leader position was part of an overall reorganization in the Kansas Billing Center, which in one way or another affected all of the employees, not just plaintiff. Both team leader positions—one which was held by Sheila Sarratt, a white female—were eliminated. Neither plaintiff nor Sheila Sarratt supervised employees after the reorganization. With regard to plaintiff's termination, his employment record is replete with written and verbal warnings concerning his tardiness, as well as other work-related problems. Plaintiff was advised about his tardiness less than a month after he began his employment, which was many months before the challenged conduct began. The defendant gave plaintiff numerous chances to improve his performance, which is evidenced by not just one, but two Final Warnings. Despite these warnings, plaintiff continued to arrive late to work and to return late from lunch. Therefore, the defendant terminated his employment. There is no evidence before the court that suggests plaintiff's race had anything to do with the defendant's decision to eliminate his position as a team leader or to terminate his employment.

In sum, plaintiff has not met his initial burden of establishing a prima facie case of race discrimination, and he has not come forward with sufficient evidence from which a reasonable factfinder could infer that the defendant's proffered reason for discharging him is unworthy of belief or that plaintiff's race was a motivating factor in the defendant's decisions. Consequently, the court grants the defendant's motion for summary judgment on plaintiff's race discrimination claims.

## IV. ADA Claim

■ The ADA prohibits employers from discriminating against a "qualified

individual with a disability" because of the individual's disability with respect to terms, conditions, or privileges of employment. *See* 42 U.S.C. § 12112(a). The ADA defines a "qualified individual with a disability" as " 'an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires.' " *Martin v. State of Kan.*, 190 F.3d 1120, 1129 (10th Cir.1999) (quoting 42 U.S.C. § 12111(8)). Thus, to prevail on his claim of discriminatory discharge under the ADA, plaintiff must establish (1) that he was disabled within the meaning of the ADA; (2) that he was qualified and still able to perform the essential functions of his job; and (3) that NMC terminated him because of his disability.[11] *Id.*

As with his race discrimination claim, plaintiff can show disability discrimination either directly or indirectly using the *McDonnell Douglas* burden-shifting format. *Pearson v. City of Manhattan*, 33 F.Supp.2d 1306, 1310 (D.Kan.1999). Plaintiff has admitted that no one ever made disparaging comments about his mental or emotional condition at work. Thus, because he is without direct evidence of discrimination, plaintiff must establish discrimination indirectly under the *McDonnell Douglas* framework.

The court finds that plaintiff has failed to establish a prima facie case of disability discrimination because he has not produced sufficient evidence showing he was disabled within the meaning of the ADA. Under the ADA, a "disability" is defined as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." *Martin*, 190 F.3d at 1129 n. 7 (quoting 42 U.S.C. § 12102(2)). It is unclear from the record, but it appears plaintiff relies only upon subsection (A) of § 12102(2) in his effort to establish that he is disabled under the ADA. "To avail [himself] of the benefits of the ADA under this theory, plaintiff must demonstrate that [his] impairment 'substantially limits one of more of [his] major life activities.' " *Wright v. Drury Inns, Inc.*, 1999 WL 1423069, at *4 (D.Kan. Dec.6, 1999) (quoting 42 U.S.C. § 12102(2)(A)).[12]

A "major life activity" is a basic activity that the average person in the general population can perform with little or no difficulty. *Pack v. Kmart Corp.*, 166 F.3d 1300, 1305 (10th Cir.1999). Major life activities include "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." *Id.* (quoting 29 C.F.R. § 1630.2(1)). Recently, the Supreme Court held that reproduction is a major life activity, *see Bragdon v. Abbott*, 524 U.S. 624, 118 S.Ct. 2196, 2204–05, 141 L.Ed.2d 540 (1998), and the Tenth Circuit held that sleeping is a major life activity, *see Pack*, 166 F.3d at 1305. Other activities such as sitting, standing, lifting and reaching may also be considered major life activities. *Lowe v. Angelo's Italian Foods, Inc.*, 87 F.3d 1170, 1173 (10th Cir.1996) (citing 29 C.F.R. § 1630.2(i)). *Id.*

Various factors are relevant in determining whether an impairment substantially limits a major life activity, including: " '(i) The nature and severity of the impairment; (ii) The duration or expected duration of the impairment; and (iii) The permanent or long term impact,

---

11. The elimination of plaintiff's position as Team Leader cannot be the basis for his ADA discrimination claim because there is no evidence that suggests plaintiff suffered from depression at the time his position was eliminated. *See Bacon v. Great Plains Mfg., Inc.*, 958 F.Supp. 523, 530 (D.Kan.1997) ("substantially limited" determination is based on plaintiff's

limitations at the time of the alleged adverse employment action).

12. NMC does not dispute that depression qualifies as a mental impairment. However, it argues that plaintiff's depression did not substantially limit any of his major life activities.

or the expected permanent or long term impact of or resulting from the impairment.'" *Aldrich v. Boeing Co.,* 146 F.3d 1265, 1269–70 (10th Cir.1998) (quoting 29 C.F.R. § 1630.2(j)(2)). "Whether an impairment 'substantially limits' a major life activity depends on the individual and the impairment. Such determinations are not susceptible to per se rules; they must be made on a case-by-case basis." *Id.* at 1270 (citing 29 C.F.R. pt. 1630 app., § 1630.2(j)).

Plaintiff alleges that he was substantially limited in the major life activity of working at the time NMC terminated his employment. "To demonstrate that an impairment substantially limits the major life activity of working, an individual must show a significant restriction in the 'ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities.'" *Wright,* 1999 WL 1423069, at *4 (quoting *Bolton v. Scrivner, Inc.,* 36 F.3d 939, 942 (10th Cir.1994)).

Plaintiff has presented no evidence whatsoever that his depression significantly restricted his ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. According to plaintiff's own doctor, after his short hospitalization, he was fully able to function in society and in his workplace and was fully able to perform the essential functions of his job without any accommodations. Moreover, plaintiff's doctor released him to return to full-time work without any limitations. Therefore, because plaintiff has failed to show his depression substantially limited his ability to work—i.e., that he was disabled and qualified for protection under the ADA—NMC is entitled to summary judgment on his disability discrimination claim.

Even if plaintiff was able to show, prima facie, that he was disabled within the meaning of the ADA, he has failed to demonstrate, as discussed in Part III *supra,* that NMC's stated reason for terminating him was pretextual. Accordingly, NMC is entitled to summary judgment for that reason as well.

### V. Sexual Harassment

Plaintiff claims Turpin asked him to his hotel room to allegedly discuss work-related topics on four separate occasions during a four-month period. Plaintiff went to Turpin's room on two of those occasions, and the evidence suggests plaintiff and Turpin did in fact discuss work-related issues. However, plaintiff claims that Turpin watched him urinate when he left the bathroom door open, looked at his crotch, and made several lewd comments during their conversations. The comments included: (1) Turpin inquiring about plaintiff's sex life with his wife; (2) Turpin telling plaintiff that the bathroom floors at work were like mirrors and that he had seen plaintiff "stroking it" in the stall next to him; (3) Turpin telling plaintiff he thought he was sexy and asking plaintiff to "stroke it" for him or at least let him see it; and (4) Turpin asking "so how long do I have ... to get into your pants before you turn all holy on me?". Pl.'s Exh. 4. Turpin and the defendant deny plaintiff's allegations.[13]

For a hostile work environment claim to be actionable, the sexual harassment "must be sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.'" *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) (quotation omitted). In order to survive summary judgment, plaintiff must produce sufficient

---

**13.** The parties disagree on the standard of liability the court should use for the analysis of plaintiff's sexual harassment claim. NMC argues that plaintiff's claim should be analyzed under a negligence standard because Turpin was a non-supervisory employee.

Plaintiff claims Turpin had "apparent authority" and argues the more strict standard of vicarious liability should apply. The court need not address this issue because the alleged conduct does not constitute actionable harassment.

evidence to allow a rational jury to find that (1) the harassing conduct was "severe or pervasive enough to create an objectively hostile or abusive work environment— an environment that a reasonable person would find hostile or abusive"; and (2) that plaintiff "subjectively perceive[d] the environment to be abusive." *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). "Whether an environment is hostile or abusive 'can be determined only by looking at all the circumstances ... [including] the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Davis v. United States Postal Serv.,* 142 F.3d 1334, 1341 (10th Cir.1998) (quoting *Harris,* 510 U.S. at 23, 114 S.Ct. 367). "'[S]imple teasing,'" ... offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the "'terms and conditions of employment.'" *Faragher v. City of Boca Raton,* 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (quotation omitted).

The Tenth Circuit has emphasized the importance of examining the totality of the circumstances when reviewing summary judgment motions:

> In *Meritor Savings Bank v. Vinson,* the Supreme Court stated that the existence of sexual harassment must be determined "in light of the record as a whole," and the trier of fact must examine the totality of the circumstances, including "the context in which the alleged incidents occurred." *Meritor,* 477 U.S. 57, 69, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) (quoting EEOC guidelines, 29 C.F.R. § 1604.11(b) (1985)) (internal quotation marks omitted). With this in mind, our hostile environment cases consistently have emphasized the need for the district court to examine the totality of the circumstances when reviewing a summary judgment motion. *See, e.g., Davis,* 142 F.3d at 1341; *Smith v. Norwest Financial Acceptance, Inc.,* 129

F.3d 1408, 1413 (10th Cir.1997). Indeed, the very term "environment" indicates that allegedly discriminatory incidents should not be examined in isolation. "[O]ne of the critical inquiries in a hostile environment claim must be the *environment.* Evidence of a general work atmosphere therefore—as well as evidence of specific hostility directed toward the plaintiff—is an important factor in evaluating the claim." *Hicks,* 833 F.2d at 1415. The Third Circuit has aptly described the need to examine the totality of the circumstances in hostile environment cases:

> A play cannot be understood on the basis of some of its scenes but only on its entire performance, and similarly, a discrimination analysis must concentrate not on individual incidents, but on the overall scenario. As the Court of Appeals for the Eleventh Circuit noted, the factfinder in this type of case should not "necessarily examine each alleged incident of harassment in a vacuum. What may appear to be a legitimate justification for a single incident of alleged harassment may look pretextual when viewed in the context of several other related incidents."

*Andrews v. City of Philadelphia,* 895 F.2d 1469, 1484 (3rd Cir.1990) (quoting *Vance v. Southern Bell Tel. & Tel. Co.,* 863 F.2d 1503, 1510 (11th Cir.1989)).

*Penry v. Federal Home Loan Bank,* 155 F.3d 1257, 1262 (10th Cir.1998).

■ In light of the record as a whole, the court finds plaintiff's allegations, assuming they are true, are insufficient to satisfy the requirement that the harassment be so severe or pervasive as to create an abusive working environment. First, the evidence indicates Turpin was not at the Kansas Billing Center on a day-to-day basis. His office was in St. Petersburg, Florida, and he occasionally traveled to the Kansas Billing Center for training and other duties. Thus, Turpin was rarely physically present in plaintiff's work environment.

Second, plaintiff describes two occasions on which Turpin made several offensive comments; he does not claim Turpin ever physically touched him in a sexual manner. Turpin allegedly made these comments at his motel room when plaintiff was visiting him on two separate occasions. On both occasions, plaintiff admits they discussed work-related matters, which was the stated purpose for Turpin's asking plaintiff to his room in the first place. The evidence does not suggest Turpin invited plaintiff to his room for the purpose of making sexual advances toward him.

Finally, nothing before the court suggests that the alleged harassment unreasonably interfered with plaintiff's work performance. Plaintiff did in fact have problems with being late arriving to work in the mornings and returning from lunch. However, he does not suggest that the alleged harassment was the reason for his tardiness. In fact, the evidence shows plaintiff experienced these problems long before Turpin even began working for the defendant.

In sum, the court finds that Turpin's alleged conduct involves isolated incidents consisting of "mere offensive utterances," which are insufficient to support plaintiff's sexual harassment claim. *See Faragher*, 524 U.S. at 788, 118 S.Ct. 2275 ("We have made it clear that conduct must be extreme to amount to a change in the terms and conditions of employment, and the Courts of Appeals have heeded this view.") (citing 1 B. Lindemann & P. Grossman, Employment Discrimination Law 805–807, n. 290 (3d ed.1996) [collecting cases granting summary judgment for employers because the alleged harassment was not actionably severe or pervasive] ).

## VI. Whistleblower Retaliatory Discharge

 Kansas recognizes the tort of retaliatory discharge as a public policy exception to the employment-at-will doctrine.

*Palmer v. Brown*, 242 Kan. 893, 752 P.2d 685, 690 (1988). The Kansas Supreme Court recently has extended the tort to include retaliatory demotion. *Brigham v. Dillon Cos.*, 262 Kan. 12, 935 P.2d 1054, 1059–60 (1997) ("We conclude that the recognition of a cause of action for retaliatory demotion is a necessary and logical extension of the cause of action for retaliatory discharge."). The federal district courts in Kansas apply the same burden-shifting framework used in discrimination cases to analyze state-law retaliation claims. *See Lierz v. Coca Cola Enters., Inc.*, 36 F.Supp.2d 1295, 1300–01 (D.Kan.1999). To establish a prima facie case for whistle-blowing, plaintiff has the burden of proving: (1) a reasonably prudent person would have concluded NMC was engaged in activities in violation of the rules, regulations, or law pertaining to public health, safety, and general welfare; (2) NMC had knowledge of plaintiff's reporting of such violation prior to discharging him; and (3) he was discharged in retaliation for making the report. *Palmer*, 752 P.2d at 690. Plaintiff must prove his claim "by a preponderance of the evidence, but the evidence must be clear and convincing in nature." *Ortega v. IBP, Inc.*, 255 Kan. 513, 874 P.2d 1188, 1189 (1994).[14] Furthermore, "[t]he whistleblowing must have been done out of good faith rather than from a corrupt motive such as malice, spite, jealousy, or personal gain." *Lierz*, 36 F.Supp.2d at 1301 (citing *Palmer*, 752 P.2d at 690).

Plaintiff claims that his position as Team Leader was eliminated and that he was ultimately fired because he discovered and reported some potential problems with CMNs completed in the Charlotte, North Carolina branch. NMC argues that it was aware of the potential problems with the CMNs by the time plaintiff made his report, and therefore, he did not "blow the whistle."

---

**14.** Evidence "is clear if it is certain, unambiguous, and plain to the understanding. It is convincing if it is reasonable and persuasive enough to cause the trier of facts to believe it." *Ortega*, 874 P.2d at 1189.

██ The court finds plaintiff is unable to sustain his burden of proving a prima facie case of retaliation for several reasons. First, the uncontroverted facts show that in June 1997, Dr. Schwebke became aware of potential problems with the completion of CMNs originating in the Charlotte branch. Upon learning of the potential problems, Dr. Schwebke immediately called the Corporate Compliance Department to report the problems and to determine the course of action she should take. Thereafter, she went to the Charlotte branch to investigate the situation, and a Corporate Compliance Team was sent to Charlotte to conduct interviews and an audit. The uncontroverted facts further establish that in late July 1997, plaintiff notified several individuals in the Homecare Division that he had discovered potential problems with the CMNs completed in the Charlotte branch. Therefore, by the time plaintiff made his report, NMC was aware of the potential problems and had begun its own investigation. In other words, the whistle had been blown, so to speak.

Second, plaintiff has failed to show the existence of a causal connection between his whistle-blowing and any retaliation against him. He reported the problems with the CMNs in late July 1997 and in late September, he received his first annual performance evaluation. Overall, plaintiff was rated "Meets Expectations." He received a deficient performance rating in the area of dependability, but he was never criticized for bringing the problems with the CMNs to the company's attention. The only criticism plaintiff received with respect to his reporting the CMN problem was the manner in which he reported. That is, he failed to follow the chain of command when he reported the concerns. Instead of informing Judy Allen or her supervisor, Chip Roy, plaintiff communicated the information to the Homecare Division, which was not his division.

The uncontroverted facts do not establish that the elimination of plaintiff's position as Team Leader was retaliatory in any manner. NMC eliminated that position as part of an overall reorganization several months after plaintiff had reported the CMN problem. During that reorganization, both Team Leader positions were eliminated, not just plaintiff's. It is not reasonable to believe NMC eliminated both positions and reorganized the entire staff in an effort to retaliate against plaintiff.

In addition, the uncontroverted facts do not show plaintiff was terminated in retaliation for reporting the CMN problem. Plaintiff's termination occurred on May 12, 1998, approximately ten months after the CMN incident. Such a remote time period between the alleged reporting and his ultimate termination is insufficient to support a reasonable inference of a causal connection. *Cf. Lierz,* 36 F.Supp.2d at 1301–02 (finding that the timing of plaintiff's termination, less than two weeks after his report, provided an inference of a retaliatory motive). Rather, the evidence demonstrates plaintiff's termination came as the result of numerous warnings regarding his tardiness and other work-related problems. Thus, the record fully supports that plaintiff was discharged for cause.

Finally, even if plaintiff could establish a prima facie case of retaliation, he has not shown that NMC's stated reason for terminating him was pretextual. *See* Part III, *supra.* Therefore, NMC is entitled to summary judgment on plaintiff's whistle-blower retaliation claim.

## VII. Intentional Infliction of Emotional Distress

Plaintiff claims that conduct of Allen and Turpin constitutes the intentional infliction of emotional distress or, as it is sometimes referred to, the tort of outrage. The defendant argues that the alleged conduct does not rise to the level necessary for a claim of outrage.

██ "Kansas has established a very high standard for the common law tort of intentional inflection of emotional distress." *Dunegan v. City of Council Grove,*

*Kan.*, 77 F.Supp.2d 1192, 1208 (D.Kan. 1999). Furthermore, "Kansas courts have been reluctant to extend the outrage cause of action to discrimination and harassment claims." *Bolden v. PRC Inc.*, 43 F.3d 545, 554 (10th Cir.1994), *cert. denied,* 516 U.S. 826, 116 S.Ct. 92, 133 L.Ed.2d 48 (1995). " 'The overwhelming majority of Kansas cases have held in favor of defendants on the outrage issue, finding that the alleged conduct was insufficiently "outrageous" to support the cause of action.' " *Wood v. City of Topeka, Kan.*, 90 F.Supp.2d 1173, 1194 (D.Kan.2000) (quotation omitted). To establish a prima facie case of outrage, plaintiff must show: (1) defendant's conduct was intentional or in reckless disregard of the plaintiff; (2) defendant's conduct was extreme and outrageous; (3) there is a causal connection between defendant's conduct and plaintiff's mental distress; and (4) plaintiff's mental distress is extreme and severe. *Bolden,* 43 F.3d at 553.

> Under Kansas law, liability for emotional distress has two threshold requirements. To resolve a motion for summary judgment on an emotional distress claim, the court must determine: (1) Whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery; and (2) whether the emotional distress suffered by plaintiff is in such extreme degree the law must intervene because the distress inflicted is so severe that no reasonable person should be expected to endure it.

*Okoye v. Medicalodge North*, 45 F.Supp.2d 1118, 1125 (D.Kan.1999) (citations omitted). Conduct is not extreme and outrageous unless it is considered as "being 'beyond the bounds of decency and utterly intolerable in a civilized society.' " *Penry,* 155 F.3d at 1264 (quoting *Moore v. State Bank,* 240 Kan. 382, 729 P.2d 1205, 1211 (1986)). "This decidedly difficult threshold has been maintained so that worthy claims may be separated from those 'based on trivialities or hyperbole.' " *Dunegan,* 77 F.Supp.2d at 1208 (quotation omitted).

█ The court has carefully considered the factual basis for this claim and finds that it does not rise to the necessary level. In Kansas, outrage claims are reserved for the most deplorable circumstances. The conduct of Turpin and Allen cannot reasonably be regarded as so extreme and outrageous that it goes beyond the bounds of decency and is utterly intolerable in a civilized society. Furthermore, although plaintiff did suffer from a bout of depression, this distress does not rise to the level of such extreme degree that the law must intervene. Accordingly, the court grants the defendant's motion for summary judgment on plaintiff's emotional distress claim.