PERSONAL WATERCRAFT INDUSTRY ASSOCIATION; A. Mason Killebrew, Jr.; Derek Coppersmith, Appellees/Cross–Appellants,

v.

DEPARTMENT OF COMMERCE; National Oceanic and Atmospheric Administration, Appellants/Cross–Appellees.

Nos. 93–5336 & 93–5348.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 6, 1995.

Decided March 3, 1995.

Ellen J. Durkee, Atty., U.S. Dept. of Justice, Washington, DC, argued the cause for appellants. With her on the briefs were Lois J. Schiffer, Acting Asst. Atty. Gen., Charles R. Shockey and David C. Shilton, Attys., U.S. Dept. of Justice, Washington, DC.

Robert B. Dickson, Washington, DC, argued the cause for appellees. With him on the brief were Michael A. Wiegard and Randall M. Stone, Washington, DC.

Before: BUCKLEY, RANDOLPH, and TATEL, Circuit Judges.

Opinion for the court filed by Circuit Judge RANDOLPH.

RANDOLPH, Circuit Judge:

These are cross-appeals from the district court's judgment setting aside one of the regulations designed to protect and preserve the Monterey Bay National Marine Sanctuary off the central California coast. The regulation governs the use of "motorized personal watercraft"—jet skis, wet bikes, miniature speed boats, air boats, hovercraft, and the like—on the Sanctuary's waters. The district court thought it arbitrary to regulate this sort of small craft without regulating other vessels. We reverse this portion of the court's judgment.

I

The Monterey Bay National Marine Sanctuary encompasses 4000 square nautical miles of coastal and ocean waters, and the submerged lands thereunder. It is the nation's largest ocean sanctuary, spreading seaward as far as forty-six nautical miles, and extending along the California coast from the Gulf of Farallones in the north to San Simeon and Cambria Rock in the south. It encompasses the Monterey Peninsula, the "finest meeting of land and water in existence," so Robert Louis Stevenson believed. The area is home to thirty-one species of marine mammals, including the sea otter and twenty-one other threatened or endangered species protected under the Endangered Species Act, 16 U.S.C. §§ 1531–1544. There are large concentrations of whales, pinnipeds (e.g., seals) and seabirds. Fish stocks are substantial. Varieties of crustaceans and other invertebrates abound. Among the Sanctuary's diverse flora are forests of giant kelp growing from the seabed, with fronds towering to the surface as much as 175 feet above. Residents and visitors use the Sanctuary for kayaking, fishing, scuba diving, surfing, sailing, swimming, and other recreational activities.

Title III of the Marine Protection, Research, and Sanctuaries Act (the Act), as amended, 16 U.S.C. §§ 1431–1439, authorizes the Secretary of Commerce to designate as national marine sanctuaries discrete areas of the marine environment that are "of special national significance." 16 U.S.C. § 1433(a). In 1988, Congress directed the Secretary to

issue a "notice of designation" under 16 U.S.C. § 1434(b)(1) for the waters in the vicinity of Monterey Bay "no later than December 31, 1989." Pub.L. No. 100–627, § 205(a)(3), 102 Stat. 3213, 3217 (1988). The National Oceanic and Atmospheric Administration (NOAA), to whom the Secretary had delegated authority, complied, but not until August 3, 1990, when it published in the Federal Register a notice of proposed designation, proposed implementing regulations, and a draft environmental impact statement discussing options for managing the proposed sanctuary. 55 Fed.Reg. 31,786 (Aug. 3, 1990). The agency requested comments within sixty days (by October 2, 1990).

In June 1992, after three public hearings and after receiving more than 1200 comments, NOAA issued its Final Environmental Impact Statement and, on September 18, 1992, its final regulations formalizing the designation of the Monterey Bay National Marine Sanctuary. 57 Fed.Reg. 43,310 (Sept. 18, 1992); 15 C.F.R. pt. 944.

One of the final regulations, 15 C.F.R. § 944.5(a)(8), limits the operation of "motorized personal water craft," also known as "thrill craft," in the Monterey Bay Sanctuary to four designated zones and access routes, an area of fourteen square nautical miles. The regulation defines "motorized personal watercraft" as:

> any motorized vessel that is less than fifteen feet in length as manufactured, is capable of exceeding a speed of fifteen knots, and has the capacity to carry not more than the operator and one other person while in operation. The term includes, but is not limited to, jet skis, wet bikes, surf jets, miniature speed boats, air boats and hovercraft.

15 C.F.R. § 944.3. NOAA's final regulations did not restrict the use of other types of vessels in the Monterey Bay Sanctuary. The agency stated that it was then working with the Coast Guard to determine whether such measures were needed. 57 Fed.Reg. at 43,-311–12.

In July 1992, the Personal Watercraft Industry Association, an organization consisting of manufacturers and distributors, submitted comments to NOAA opposing the restrictions placed on personal watercraft. Thereafter the agency denied the Association's petition for rulemaking to rescind the "thrill craft" regulation. 58 Fed.Reg. 15,271 (Mar. 22, 1993).

The Association and two individuals then brought this action for judicial review of the regulation in the district court. Their complaint contained four claims for relief. The first three were of a piece: the regulation was not supported by adequate evidence; the agency had no basis for regulating personal watercraft but not regulating other vessels; the record does not contain evidence to show that restricting the use of personal watercraft was "necessary or reasonable." Complaint ¶¶ 25–34. The fourth claim was that NOAA failed to respond to the Association's comments that the restrictions were unreasonable and unnecessary. Complaint ¶ 36.

On cross-motions for summary judgment, the district court held that the restriction on personal watercraft was arbitrary and capricious because NOAA had treated personal watercraft differently from all other vessels without providing a sufficient explanation. *Personal Watercraft Indus. Ass'n v. Department of Commerce*, No. 93–1381, at 3 (D.D.C. Aug. 24, 1993). The court rejected the Association's claim that NOAA should have replied to its comments. *Id.* at 2–3 n.1.

## II

### A

■ We begin with the Association's argument that NOAA did not adequately respond to its comments. There is little to this. The comment period closed on October 2, 1990. 55 Fed.Reg. at 31,786. The Association submitted its comments in July .1992.[1]

---

1. When NOAA issued its "Final Environmental Impact Statement/Management Plan" on June 12, 1992, its cover letter stated that any "questions or comments" about it should be submitted by July 20, 1992. While this enabled interested parties to have their say about the document, the cover letter did not—nor did it purport to—reopen the period set forth in the Federal Register (as 5 U.S.C. § 553 required) for commenting

Agencies are free to ignore such late filings, as for the most part NOAA did here. *Tex. Tin Corp. v. EPA*, 935 F.2d 1321, 1323 (D.C.Cir.1991). The Association's tardiness cannot be excused. The 1990 notice of proposed rulemaking sufficiently alerted it to the possibility of NOAA's regulating personal watercraft. It is true that in the notice NOAA did not propose to regulate personal watercraft. But the distinct prospect of the agency's doing so was plain for all to see. Under the heading "Activities Subject to Regulation," the 1990 notice listed numerous activities "subject to regulation, including prohibition, to the extent necessary and reasonable" to ensure the successful implementation of the Sanctuary designation. 55 Fed. Reg. at 31,788. One of the activities was operating "thrill craft" in the Sanctuary. *Id.* To indicate what the agency had in mind, the proposed regulations included a definition of "thrill craft," a definition matching the final regulation's description of "motorized personal watercraft." *Id.* at 31,794. When NOAA announced the schedule for public hearings, it mentioned that "[t]wo other activities are potentially subject to regulations: commercial vessel traffic (other than fishing) and operation of 'thrill craft.'" 55 Fed.Reg. 31,-798 (Aug. 3, 1990). The 1990 notice of proposed rulemaking also referred to the Draft Environmental Impact Statement; this document discussed "the serious threat" to the Sanctuary posed by personal watercraft. The 1990 notice thus "adequately frame[d] the subjects for discussion . . . ," *Connecticut Light & Power Co. v. NRC*, 673 F.2d 525, 533 (D.C.Cir.), *cert. denied*, 459 U.S. 835, 103 S.Ct. 79, 74 L.Ed.2d 76 (1982). Nothing more was necessary.

### B

■ The Association complains about a "study" NOAA used in determining where personal watercraft would be allowed within the Sanctuary, but it is hard to tell exactly what the complaint is. Only two paragraphs of the Association's fifty-page brief are devoted to this topic; the summary of argument ignores it entirely. The two paragraphs are under the following heading,

which does not talk directly about the study: the "personal watercraft restrictions were developed after the comment period closed and never made available for public scrutiny and comment." Appellees' Brief at 47. That of course is true with respect to NOAA's final regulations, and indeed would be true in any rulemaking proceeding in which an agency formulated its final rules in response to comments. If the heading is supposed to capture a colorable argument, we fail to see it. "Rulemaking proceedings would never end if the agency's response to comments must always be made the subject of additional comments." *Community Nutrition Inst. v. Block*, 749 F.2d 50, 58 (D.C.Cir.1984).

Perhaps a bit of background will clear things up. After the comment period on the proposed regulations closed in October 1990, NOAA retained Dr. James W. Rote, a marine biologist and former Director of the Office of Habitat Protection at NOAA. Dr. Rote was to "gather information about current restrictions and current areas of motorized personal watercraft use in the proposed Monterey Bay National Marine Sanctuary area" and "to develop recommended zones to which motorized personal watercraft use might be restricted." In June and October 1991, Dr. Rote delivered his recommendations. The four zones he suggested were designed to encompass the areas with the highest amount of personal watercraft use. The results of Dr. Rote's study were included in the final rulemaking. 57 Fed.Reg. at 43,328–29.

■ The Association states the obvious when it mentions that it did not have a chance to comment on the study because Dr. Rote did his work after the comment period closed. Given the cases the Association cites—*Portland Cement Ass'n v. Ruckelshaus*, 486 F.2d 375 (D.C.Cir.1973), *cert. denied*, 417 U.S. 921, 94 S.Ct. 2628, 41 L.Ed.2d 226 (1974); and *United States v. Nova Scotia Food Products Corp.*, 568 F.2d 240, 252 (2d Cir.1977)—it seems to be saying that NOAA had a duty to put the study out for comment. As best we can make out, that is the extent of the Association's argument and it is one

on proposed regulations, a period that had      closed more than a year earlier.

we readily reject.[2] *Portland Cement* and *Nova Scotia* can be put to one side. *See also Association of Data Processing Serv. Orgs. v. Board of Governors,* 745 F.2d 677, 684 (D.C.Cir.1984). While those decisions say that material critical to an agency's decision whether to regulate an activity must be revealed, the study here was not of that sort. NOAA's decision was the product, not of Dr. Rote's study, but of its concern about the threat to the Sanctuary and the concern expressed in hundreds of comments urging the agency to ban personal watercraft altogether. 57 Fed.Reg. at 43,314. Agencies may develop additional information in response to public comments and rely on that information without starting anew "unless prejudice is shown." *Community Nutrition Inst.,* 749 F.2d at 58. The party objecting has the burden of "indicat[ing] with 'reasonable specificity' what portions of the documents it objects to and how it might have responded if given the opportunity." *Small Refiner Lead Phase–Down Task Force v. EPA,* 705 F.2d 506, 540–41 (D.C.Cir.1983). The Association has not even come close to shouldering that burden. It does not point to anything in Dr. Rote's findings that might be considered erroneous. It does not suggest that his methodology was in any wise defective. And it does not tell us what it might have told NOAA if the study had been conducted and released before the comment period closed.

## III

The district court agreed with the Association that the regulation treated "personal watercraft (which are narrowly defined) differently from all other vessels, and that this disparate treatment is arbitrary and unsupported by the factual record." *Personal Watercraft Industry Ass'n,* No. 93–1381,

at 2. It is worth keeping in mind that we are dealing with a marine sanctuary and measures an agency thought were needed to protect and preserve it. The regulations did indeed single out personal watercraft from other kinds of vessels. Maybe the presence of other vessels was a cause for concern; as we shall see, NOAA thought it might be. This scarcely means that NOAA had to regulate them if it was to do anything about thrill craft. An agency does not have to "make progress on every front before it can make progress on any front." *United States v. Edge Broadcasting Co.,* —— U.S. ——, ——, 113 S.Ct. 2696, 2707, 125 L.Ed.2d 345 (1993). Agencies often must contend with matters of degree. Regulations, in other words, are not arbitrary just because they fail to regulate everything that could be thought to pose any sort of problem. *Las Vegas v. Lujan,* 891 F.2d 927, 935 (D.C.Cir.1989); *Louisiana v. Verity,* 853 F.2d 322, 332 (5th Cir.1988). This is a common principle, well known not only in administrative law cases but also in constitutional cases raising equal protection challenges to economic regulation. *See Williamson v. Lee Optical of Oklahoma Inc.,* 348 U.S. 483, 489, 75 S.Ct. 461, 465, 99 L.Ed. 563 (1955). To it, the district court here added a wrinkle—when an agency decides "to address several aspects of the problem itself in a single rulemaking, it must provide a reasoned basis for differential treatment of the various causes of the perceived problem." *Personal Watercraft Industry Ass'n,* No. 93–1381, at 4 n.2. This suggests that if an agency did a little, that would be permissible, but if it did more than a little, it had better have a good reason for not going all the way. We fail to see why it should matter whether the agency takes two steps instead of one, so long as it is heading in a proper direction.[3] The patient has a headache, a sore throat

---

**2.** There is part of a footnote in the Association's reply brief that talks about "the regulation's irrational effect of banishing affected recreational vessel users to four discrete, off-shore areas Dr. Rote devised by drawing lines on a map...." Cross–Appellants' Reply Brief at 9 n. 5. We emphatically refuse to construe this statement in the reply brief, which the author merely asks us to "consider," as expressing some new argument about the study, distinct from the Association's apparent complaint about not having a chance to comment on it. *See Rollins Envtl. Servs. (NJ)*

*Inc. v. EPA,* 937 F.2d 649, 653 n. 2 (D.C.Cir. 1991).

**3.** Besides, it is far from clear how the court's "rule" applies to this case. The court must have thought NOAA's rulemaking addressed "several aspects of the problem itself." Which problem and which aspects? The court did not say. So far as we can tell the regulation dealt only with one aspect—the mischief associated with vessels of the thrill craft variety, and that is what doomed it in the district court's eyes.

and a hangnail. Are we to suppose that it would be arbitrary to treat only the headache and the sore throat in a single session, yet not be arbitrary to treat only the hangnail?

Before discussing this further, we ought to examine what made jet skis and other thrill craft the headache. The record is full of evidence that machines of this sort threatened the Monterey Bay National Marine Sanctuary. NOAA received written comments and testimony from marine scientists, researchers, federal agencies, state agencies, state and local governments, business organizations, and more than a hundred citizens on the issue of regulating these machines. Everyone agreed—personal watercraft interfered with the public's recreational safety and enjoyment of the Sanctuary and posed a serious threat to the Sanctuary's flora and fauna. The concept of a "sanctuary" entails · elements of serenity, peace, and tranquility. Yet the commenters described instances of personal watercraft operators harassing sea otters and other marine mammals, disturbing harbor seals, damaging the Sanctuary's kelp forests, menacing swimmers, divers, kayakers, and other recreational users, and generally disrupting the esthetic enjoyment of the Sanctuary. All concerned recommended either prohibiting personal watercraft outright or restricting them to specific areas in the Sanctuary. No one urged NOAA to do nothing about the problem.

When NOAA acted, did it satisfactorily explain itself? The Administrative Procedure Act required it to give a "concise general statement" of the regulation's "basis and purpose." 5 U.S.C. § 553(c). Here is part of what NOAA said:

The small size, maneuverability and high speed of these craft is what causes these craft to pose a threat to resources. Resources such as sea otters and seabirds are either unable to avoid these craft or are frequently alarmed enough to significantly modify their behavior such as cessation of feeding or abandonment of young. Also other, more benign uses of the Sanctuary such as sailing, kayaking, surfing and diving are interfered with during the operation of [personal watercraft].

> \* \* \* \* \* \*

This regulation is intended to provide enhanced resource protection by prohibiting operation of motorized personal watercraft in areas of high marine mammal and seabird concentrations, kelp forest areas, river mouths, estuaries, lagoons and other similar areas where sensitive marine resources are concentrated and most vulnerable to disturbance and other injury from personal watercraft.

57 Fed.Reg. at 43,314, 43,321. The first paragraph is the "basis," the second the "purpose." The statement is "concise" and it is "general."

Despite NOAA's evident compliance with the Administrative Procedure Act, the Association rails against "NOAA's unsupported and unexplained distinction between personal watercraft and other similar and larger vessels," Appellees' Brief at 32. The Association is very much mistaken and its citation of, for example, *National Wildlife Federation v. Costle,* 629 F.2d 118, 133–35 (D.C.Cir.1980), is therefore off the mark. NOAA did explain and support the distinction. It said that personal watercraft were small, highly maneuverable, and fast, and it indicated that they operated close to shore, in areas of high concentrations of kelp forests, marine mammals and sea birds. That differentiated all larger craft, all slower craft, all less maneuverable craft, and all craft that did not tend to use the same areas in the same manner. As if this were not enough, NOAA also stated why it had decided not to regulate vessels other than personal watercraft *at this time.* NOAA said that it was working with the United States Coast Guard "to determine the need for additional measures to ensure protection of Sanctuary resources and qualities from vessel traffic," adding that:

These consultations aim to determine which resources are most at risk, which vessel traffic practices are most threatening and which regulations or restrictions would be most appropriate to alleviate potential threats, including those, if any, from foreign vessels.

57 Fed.Reg. at 43,311.

There for all who read the Federal Register are the reasons for NOAA's regulating per-

sonal watercraft and for not then regulating other vessels—the first category posed a clear problem, the rest needed further study, which the agency had undertaken.[4]

The Act authorized NOAA to set down rules for the Sanctuary that it determined "may be necessary and reasonable." 16 U.S.C. § 1434(a)(1)(A). The record amply supports NOAA's judgment of September 1992, that restricting thrill craft was then necessary and reasonable. It may turn out that regulating other vessels will be also be necessary and reasonable. NOAA has yet to make that determination. But nothing in Title III of the Marine Protection, Research, and Sanctuaries Act, or in the Administrative Procedure Act, or in any judicial decision, forces an agency to refrain from solving one problem while it ponders what to do about others.

In concluding, we should say a few words about the district court's remark that before regulating, NOAA should have considered the sufficiency of existing restrictions. *Personal Watercraft Indus. Ass'n*, No. 93–1381, at 3. There is no need to worry over the legal principle the court's statement embodies. The record shows that NOAA in fact did what the court thought it should have done. As NOAA pointed out in its Final Environmental Impact Statement, personal watercraft use was a relatively new phenomenon and local governments had only just begun issuing laws to minimize conflicts between this form of water sport, and other uses of marine resources. Many local officials urged NOAA to restrict jet skis; the towns of Capitola and Pacifica, and the County of Santa Cruz had their own restrictions, but these of course applied only within their jurisdictions. NOAA's regulatory jurisdiction—over 4000 square nautical miles—was considerably more comprehensive. As one would expect, the agency therefore deter-

mined that regulating personal watercraft throughout the Sanctuary was needed to fill what would otherwise have been a "major gap in the regulatory regime governing activities in the area."

\* \* \* \* \* \*

NOAA's personal watercraft regulation, 15 C.F.R. § 944.5(a)(8), is not arbitrary and capricious, and the district court's judgment is therefore

*Reversed.*

4. In its cross-appeal, the Association contends that we should not uphold NOAA's regulation because the agency did not file the entire administrative record in the district court. The district court did not think much of this contention and neither do we. NOAA filed all of the material it relied on in promulgating the personal watercraft regulation. This material has been condensed into five thick volumes of an appendix. The Association wanted the agency to add still more material dealing with other vessels such as oil tankers. We neither need nor want that material. The "whole record" (5 U.S.C. § 706) pertaining to the regulation the Association challenges is before us. And we have seen more than enough to know that the agency's decision not to regulate other vessels at this time does not render its decision to regulate personal watercraft arbitrary or capricious.