**Douglas J. BOE, Plaintiff,**

v.

**ALLIEDSIGNAL INC., AlliedSignal Avionics, Inc., individually and/or as a subsidiary of AlliedSignal Inc., Defendants.**

Civil Action No. 99–2188–GTV.

United States District Court, D. Kansas.

Feb. 15, 2001.

John F. Wilcox, Jr., Dysart, Taylor, Lay, Cotter & McMonigle, P.C., Kansas City, MO, David M. Peterson, Peterson & Associates, P.C., Kansas City, MO, for Douglas J. Boe.

William C. Martucci, Eric W. Smith-Shook, Hardy & Bacon L.L.P., Kansas City, MO, J. Nick Badgerow, Daniel B. Boatright, Spencer, Fane, Britt & Browne, Overland Park, KS, Patrick W. McGovern AlliedSignal, Inc. Morristown, NJ, for AlliedSignal, Inc., AlliedSignal Avionics Inc.

Floyd R. Finch, Jr., Blackwell Sanders Peper Martin LLP, Kansas City, MO, for Motorola Inc.

## MEMORANDUM AND ORDER

VANBEBBER, Senior District Judge.

Plaintiff Douglas J. Boe brings this action principally under the Americans with Disabilities Act ("ADA") against his former employer, AlliedSignal. Plaintiff's first amended complaint contains ten

counts with the following claims: discrimination under the ADA (Count I); retaliation under the ADA (Count II); discrimination under the ADA—disparate impact (Count III); discrimination under the Kansas Act Against Discrimination (Count IV); retaliation under the Kansas Act Against Discrimination (Count V); retaliatory discharge for whistleblowing (Count VI); breach of public policy (Count VII); intentional infliction of emotional distress (Count VIII); tortious interference with a business relationship (Count IX); and defamation (Count X). The case is now before the court on Defendants' Motion for Summary Judgment (Doc. 133). Defendants' summary judgment motion addresses only Counts II and VI through X. For the reasons stated below, the court grants Defendants' motion.

The facts leading to Plaintiff's lawsuit can be summarized as follows: Plaintiff is a former employee of Defendants. After Plaintiff made several reports of alleged improper accounting practices within the company, Plaintiff began seeing a psychiatrist and took a medical leave of absence. His psychiatrist eventually released him to return to work, but the company terminated his employment. Later, a representative of the company made some comments regarding Plaintiff's work performance to the Securities and Exchange Commission ("SEC"), who was considering hiring Plaintiff. The comments allegedly resulted in the SEC's failure to hire Plaintiff. As a result of this chain of events, Plaintiff filed the instant lawsuit, which is now before the court on Defendants' summary judgment motion.

## I. Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). The requirement of a "genuine" issue of fact means that the evidence is such that a reasonable jury could return a verdict for the nonmoving party. See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52, 106 S.Ct. 2505.

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. This burden may be met by showing that there is a lack of evidence to support the nonmoving party's case. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has properly supported its motion for summary judgment, the burden shifts to the nonmoving party to show that there is a genuine issue of material fact left for trial. See *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505. "A party opposing a properly supported motion for summary judgment may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Id.* Therefore, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. See *id.* The court must consider the record in the light most favorable to the nonmoving party. See *Bee v. Greaves*, 744 F.2d 1387, 1396 (10th Cir.1984).

## II. Statement of Facts

The following facts are taken from the summary judgment record and are either uncontroverted or viewed in the light most favorable to Plaintiff's case. Immaterial facts and facts not properly supported by the record are omitted.

In 1995, Plaintiff began working as the controller of Defendant AlliedSignal's Commercial Avionics Systems division ("CAS division") in Redmond, Washington. The CAS division was part of AlliedSignal's aerospace sector. After about a year,

Plaintiff was transferred to Olathe, Kansas, where he became responsible for all accounting-related matters for the CAS division. When he transferred to Olathe, Plaintiff began reporting to Andy Wilson, Chief Financial Officer of the CAS division. Andy Wilson reported to Tom Zusi, Vice President/Chief Financial Officer of AlliedSignal's aerospace sector.

While Plaintiff was employed by Defendants, his job performance was evaluated twice, in February of 1996 and 1997. Both times, his overall rating was at or above standards.

From late 1996 through early 1997, Plaintiff made several in-house reports of alleged wrongdoing within the company. The following is an abbreviated summary of his reports:

(1) Plaintiff refused to sign year-end 1996 and first quarter 1997 "management representation letters," which are letters attesting to the fairness and completeness of financial statements, because he believed that certain accounting entries violated securities laws. Plaintiff informed Andy Wilson, one of the people who instructed Plaintiff to make the entries, of his refusal to sign the letters. He also reported to Ann Tidball, Human Resources Vice President for the CAS division and Business Conduct Leader,[1] that he was refusing to sign the letters because he thought securities laws were being violated. Plaintiff alleges that senior executives in the company, including Tom Zusi, directed that the illegal entries be made in order to achieve earnings goals that would ensure large bonuses for the executives.

(2) In December of 1996, Plaintiff told Rhonda Summers, Manager of Government Compliance, and one other employee that he believed Human Resources was withholding information regarding the taxable income of some employees.

(3) In January of 1997, Plaintiff e-mailed three employees regarding his concerns about the company treating certain income as tax-exempt. He alleges he was told in response that the company was going to cheat and that he could do nothing about it. Plaintiff then reported the exchange to Andy Wilson and Ann Tidball.

(4) In approximately January of 1997, Plaintiff reported alleged bribes to Andy Wilson and the company hotline. He also spoke with an in-house attorney, John Sciallo, about his concerns.

In March of 1997, an anonymous caller to the company hotline alleged that Plaintiff and two of his subordinates had improperly shifted costs from 1996 to 1997 in order to make 1996 earnings targets. An internal investigator concluded that there was no attempt to shift costs to meet earnings targets. However, the investigation produced at least one damaging report which stated that the financials of the CAS division were "gamed" by between five and ten million dollars.

Also in March of 1997, Plaintiff began seeing a psychiatrist. He was experiencing "anxiety, sleeplessness, lack of ability to concentrate, lack of ability to reason properly, shakiness, inability to organize, increased rapidity and amount of speech, and inability to concentrate on complex tasks." Plaintiff's symptoms became progressively worse by the middle of May 1997. Eventually, Plaintiff was diagnosed with bipolar affective disorder. After exhibiting disruptive behavior at a meeting on June 23 or 24, 1997, Plaintiff began a medical leave of absence, and was on medical leave until he was fired in June of 1998.

Sometime in 1997, Tom Zusi told Richard Wallman, Chief Financial Officer of Defendant AlliedSignal, of Plaintiff's allegations of financial improprieties. Richard Wallman instructed his audit team to investigate the allegations. The audit team

---

**1.** The Business Conduct Leader was responsible for integrity and ethics compliance in the CAS division.

concluded that some of Plaintiff's allegations were valid, but others were unsupported.

On January 9, 1998, Plaintiff's psychiatrist released Plaintiff to return to work. Defendants requested that Plaintiff undergo another examination, however, before allowing him to return to work. The psychiatrist who conducted the second examination, Dr. Rosalyn Innis, concluded as follows:

While [Plaintiff] is competent and has had some symptoms decrease while away from [the company], I must question the feasibility of his return to the company, at this or any time based on the following: .... Psychological testing would show that [Plaintiff] has a strong paranoid component, he also has little if any language for feelings and few outlets for those experiences. The anxiety that he experienced in the situation with [Defendants] was of major proportion and quite disorganizing to him, fortunately he sought help and was able to take short term disability leave with the company. Unless the conditions that he experienced or suspected were occurring within the company have changed, he is very likely to once again experience increasing levels of anxiety, irritability, and disorganization and ultimately a full recurrence of symptoms. Whether by intent or accident the potential for a comment or glance to be reinterpreted with a negative slant is still there and you'll end up in court again with [Plaintiff]. Events to date have set up both [Plaintiff] as well as the company to encounter further difficulty. I do not recommend that he return to [work for Defendants].

After receiving Dr. Innis's report, Defendants decided to terminate Plaintiff's employment. On June 4, 1998, Tammy Wolfe, a human resources representative, advised Plaintiff by letter as follows:

Based on Dr. Innis' report and recommendations, we believe it is not in your or [Defendants'] best interests to return you to the workplace. The often disruptive, unpredictable and volatile behavior that you exhibited prior to your leave has caused many employees to express continued fear and concerns about working with you. You have destroyed the trust that must exist in any employment relationship, particularly a leadership position. Based on those concerns and the conclusions of Dr. Innis, we are also concerned and fearful that the behaviors you exhibited last spring and summer will likely occur again if you return to [the company]. Thus, [Defendants do] not believe that it is in the best interests of our current employees, you or [Defendants] to reinstate you and your employment with [Defendants] will be terminated effective June 12, 1998.

Tom Zusi, Tammy Wolfe, and Dominic Romeo (who would have been Plaintiff's supervisor if Plaintiff had returned to work) all participated in the decision to fire Plaintiff. All three decision-makers knew of Plaintiff's allegations of improper accounting practices.

In May of 1999, Plaintiff was living in Maryland. He applied for a position as a staff accountant in the enforcement division of the Securities and Exchange Commission in Washington, D.C. In July of 1999, Plaintiff received a letter from the SEC which stated that he had been recommended for appointment, pending "certain clearances, including satisfactory pre-appointment checks and inquiry into your background, training and suitability for the position indicated." In August, the SEC rescinded its recommendation for appointment. Regina Barrett, an SEC employee, told Plaintiff that the recommendation was rescinded because of disparaging statements made by Richard Wallman. In her deposition, Regina Barrett testified that Richard Wallman had first asked whether the SEC had made an offer to Plaintiff. Richard Wallman then told her that Plaintiff "sometimes did good work but it was inconsistent." Richard Wallman also said, "Then I should say no comment," and "What does that tell you?"

Any knowledge Richard Wallman had about Plaintiff's performance would have

been obtained through Plaintiff's appraisals and Plaintiff's superiors. Richard Wallman's comments were made in violation of company policy, which was to provide only the starting date, ending date, final salary, and title of a former employee. Plaintiff alleges that Richard Wallman had incentive to give false information to the SEC, because he was an executive who received bonuses based on earnings.

## III. Discussion

### A. Retaliation under the ADA

■ In Count II of his amended complaint, Plaintiff asks the court for compensatory and punitive damages for Defendants' alleged violation of the ADA's retaliation provision, 42 U.S.C. § 12203.[2] However, an analysis of § 12203 and the remedies associated with it reveals that Congress did not provide for compensatory and punitive damages for violations such as the one alleged by Plaintiff.

The court has found only two other federal courts which have undertaken such analysis. The United States District Court for the Western District of Missouri, in *Brown v. City of Lee's Summit*, Mo., No. 98–0438–CV–W–2, 1999 WL 827768, 9 AD Cases 1337 (W.D.Mo. June 1, 1999), concluded that no compensatory or punitive damages are available for a plaintiff alleging employment retaliation under the ADA. The other court, the United States District Court for the Eastern District of California, in *Ostrach v. Regents of the Univ.*, 957 F.Supp. 196 (E.D.Cal.1997), reached the opposite conclusion. This court agrees with the Western District of Missouri, and concludes that Defendants are entitled to summary judgment on Plaintiff's claim for retaliation under the ADA, to the extent it requests compensatory and punitive damages. The following analysis supports this conclusion.

**2.** Plaintiff also requests equitable relief, prejudgment interest, and attorney fees. This opinion does not address those requests.

**3.** The statutory language reads: "The remedies and procedures available under sections

The ADA includes four primary subchapters. The first three subchapters contain remedial provisions. Subchapter I (42 U.S.C. §§ 12111 to 12117) relates to employment and contains the remedial provisions for employment cases.

The fourth subchapter contains miscellaneous provisions, including 42 U.S.C. § 12203, the prohibition on retaliation at issue in this case. The fourth subchapter does not have its own remedial provisions. It effectively "borrows" remedies from the first three subchapters, depending on what type of retaliation case is at issue.[3] For example, if the case is an employment retaliation case (as is the instant case), the remedial provisions of subchapter I, specifically § 12117, are used.

In this case, then, the court must look to 42 U.S.C. § 12117 to determine the remedy available to Plaintiff. Section 12117 adopts the remedies set forth in 42 U.S.C. § 2000e–5 (Title VII of the Civil Rights Act of 1964). See 42 U.S.C. § 12117. Section 2000e–5, in turn, does not provide for compensatory or punitive damages. The Civil Rights Act of 1991, however, provides that damages are available in the following cases:

[i]n an action brought by a complaining party under the powers, remedies, and procedures set forth in ... [42 U.S.C. §§ 2000e–5 or 2000e–16] (as provided in section 107(a) of the Americans with Disabilities Act of 1990 (42 U.S.C. 12117(a)), and section 794a(a)(1) of Title 29, respectively) against a respondent ... who violated ... section 102 of the Americans with Disabilities Act of 1990 (42 U.S.C. 12112), or committed a violation of section 102(b)(5) of the Act [42 U.S.C. § 12112(b)(5) ], against an individual....

12117, 12133, and 12188 of this title shall be available to aggrieved persons for violations of subsections (a) and (b) of this section, with respect to subchapter I, subchapter II and subchapter III of this chapter, respectively." 42 U.S.C. § 12203(c).

42 U.S.C. § 1981a(a)(2). The statutory language indicates that compensatory and punitive damages are available for violations of §§ 12112 and 12112(b)(5). The statute makes no mention of § 12203. Because the provision does not mention § 12203, the court must conclude that Congress did not intend to provide for compensatory and punitive damages for retaliation claims under § 12203.

As noted above, the United States District Court for the Western District of Missouri came to the same conclusion in *Brown v. City of Lee's Summit, Mo.* In *Brown*, Judge Gaitan worked through the statutory analysis, and also concluded that compensatory and punitive damages are not available in an employment retaliation case under the ADA. In addition to the relevant statutory language noted above, Judge Gaitan cited the legislative history of the ADA to support his conclusion. See *Brown*, 1999 WL 827768, at *2. Judge Gaitan rejected the reasoning in *Ostrach v. Regents of the Univ.*, where the Eastern District of California held that compensatory and punitive damages are available. See *id.* at *3–*4. This court does the same. The court concludes that Plaintiff is entitled only to equitable relief on his ADA employment retaliation claim and is not entitled to compensatory or punitive damages.

■ Absent entitlement to compensatory and punitive damages, Plaintiff is not entitled to a jury trial for his retaliation claim under the ADA (Count II). See 42 U.S.C.1981a(c).

**B. Retaliatory Discharge for Whistleblowing[4]**

Count VI of Plaintiff's amended complaint alleges that, in contravention of Kansas state law, Defendants discharged Plaintiff in retaliation for his "whistleblowing." The Kansas Supreme Court has recognized retaliatory discharge for whistleblowing as an exception to the at-will employment doctrine. See *Palmer v. Brown*, 242 Kan. 893, 752 P.2d 685 (1988). *Palmer v. Brown* established the elements for a prima facie case of retaliatory discharge:

■ To maintain such action, an employee has the burden of proving by clear and convincing evidence, under the facts of the case, a reasonably prudent person would have concluded the employee's co-worker or employer was engaged in activities in violation of rules, regulations, or the law pertaining to public health, safety, and the general welfare; the employer had knowledge of the employee's reporting of such violation prior to discharge of the employee; and the employee was discharged in retaliation for making the report. *Id.* 752 P.2d at 690. A plaintiff must prove his or her claim by a preponderance of the evidence, but the evidence must meet the "clear and convincing" standard. See *Rebarchek v. Farmers Coop. Elevator & Mercantile Ass'n*, 13 P.3d 17, 22(Kan.Ct.App.2000). If the plaintiff establishes a prima facie case, the court then will apply the burden-shifting analysis used in discrimination cases. See *Glover v. NMC Homecare, Inc.*, 106 F.Supp.2d 1151, 1169 (D.Kan.2000).

The whistleblower's report may be "to either company management or law enforcement officials." *Palmer*, 752 P.2d at 690. Defendants argue that reporting to a wrongdoer does not constitute whistleblowing—i.e., because Plaintiff reported some alleged rule infractions to Andy Wilson, who himself was directing those rule infractions, Plaintiff's reporting did not amount to whistleblowing.[5] This court has

---

4. Plaintiff terms this claim a "wrongful discharge" claim. After reading Plaintiff's claim, the court concludes that "retaliatory discharge" more accurately describes the claim.

5. Defendants cite the court to *Faust v. Ryder Commercial Leasing & Servs.*, 954 S.W.2d 383

(Mo.Ct.App.1997). Faust, a Missouri Court of Appeals case, does indeed stand for the proposition that there is no whistleblowing if the employee merely tells a wrongdoer of the wrongdoing. However, this court is not bound by Missouri law.

found only one Kansas case in which an employee discussed a "wrongdoing" with a supervisor who was also a wrongdoer. In *Fowler v. Criticare Home Health Servs., Inc.,* 27 Kan.App.2d 869, 10 P.3d 8 (Kan. Ct.App.2000), a supervisor instructed an employee to ship some guns, and the employee told his supervisor that he thought the shipment was unlawful, and refused to make the shipment. *Fowler,* 10 P.3d 8, 11. The employee also threatened to report the supervisor if the supervisor made the shipment. See *id.* The supervisor made the shipment after the employee left the building. See *id.* The Kansas Court of Appeals held that the employee's disagreement with his supervisor "was just that [a disagreement]; it did not qualify as an internal report to management of illegal coworker or company conduct.... A worker who wants to come under the protections of [Palmer] *must seek out the intervention of a higher authority,* either inside or outside of the company." *Id.* at 10 P.3d at 14 (emphasis added).

■ Using Fowler as guidance, this court concludes that Plaintiff's conveyance of his refusal to sign management representation letters to Andy Wilson was a mere disagreement. He did not appear to be "seek[ing] out the intervention of a higher authority." See *id.* Instead, Plaintiff was merely taking a stand, as the employee in Fowler did. The court concludes that Plaintiff's communication to Andy Wilson that he was refusing to sign management representation letters was not whistleblowing. However, Plaintiff's other reports to Rhonda Summers, Andy Wilson, John Sciallo, and Ann Tidball appear to be more than merely voicing his disagreement. Consequently, as to Plaintiff's other reports, the court must evaluate whether Plaintiff was discharged in retaliation for making them.

Defendants have not challenged whether Plaintiff can meet the first two elements of a retaliatory discharge prima facie case. The court concludes that Plaintiff can meet

those elements. The only element at issue is the third, causation—whether Plaintiff was discharged in retaliation for making his reports.

■ When evaluating whether causation has been established, Kansas courts look to whether close temporal proximity existed between the whistleblowing activity and the discharge. See *Rebarchek,* 13 P.3d 17, 23.[6] "Proximity in time between the [report] and the firing is a typical beginning-point, coupled with evidence of satisfactory work performance and supervisory evaluations." *Id.* (quoting *Marinhagen v. Boster, Inc.,* 17 Kan.App.2d 532, 840 P.2d 534 (1992) (citation omitted)). If the case lacks close temporal proximity, a plaintiff still may withstand a summary judgment motion by demonstrating a pattern of retaliatory conduct stretching from the whistleblowing activity to the termination. See *id.* 13 P.3d at 24.

■ In the instant case, Plaintiff made reports of alleged accounting improprieties between late 1996 and early 1997. He went on medical leave of absence in June of 1997, and was fired in June of 1998. Plaintiff has failed to establish a close temporal proximity between his reports and the termination of his employment. Furthermore, Plaintiff has failed to establish a pattern of retaliatory conduct. Plaintiff seems to suggest that the March 1997 anonymous call to Defendants' hotline was in retaliation for his whistleblowing actions. However, even if the court accepts this allegation as true, one instance does not establish a "pattern" of retaliatory conduct.

Finally, Plaintiff has failed to establish a causal connection because he has not directed the court to any other circumstantial evidence which would tend to prove that the three decision-makers in his termination fired him because of the reports he made. Plaintiff alleges that Tom Zusi, Tammy Wolfe, and Dominic Romeo all

---

**6.** Rebarchek is a case involving retaliation for filing a workers' compensation claim. The same principles enunciated in Rebarchek apply to a retaliation case for whistleblowing.

knew of his whistleblowing, and he asks the court to make the assumption that because they knew of his actions, they must have fired him because of those actions. The court is unwilling to make that assumption.

As circumstantial evidence, Plaintiff also points the court to his two positive performance appraisals. Plaintiff's performance was evaluated in February of 1996 and February of 1997. Both evaluations were completed before Plaintiff began experiencing mental problems, the proffered reason Defendants gave for Plaintiff's dismissal. The court concludes that Plaintiff has not presented evidence from which a reasonable jury could find causation. Plaintiff has failed to establish a prima facie case of retaliatory discharge, and Defendants are entitled to summary judgment on Count VI.

### C. Breach of Public Policy

Plaintiff alleges in Count VII of his amended complaint that the termination of his employment was in violation of the public policy behind the Kansas Act Against Discrimination, the ADA, and Kansas common law which protects whistleblowing. Although Plaintiff failed to provide the court with reasons why summary judgment should not be granted as to Count VII in his response to Defendants' summary judgment motion, the court has considered the relevant law regarding Plaintiff's claim.

 Kansas has adopted the "alternative remedies doctrine." Under this doctrine, where there is an adequate remedy by statute, a court will not recognize a common law cause of action. See *Flenker v. Willamette Indus., Inc.*, 266 Kan. 198, 967 P.2d 295, 299 (1998). The Tenth Circuit has held that this doctrine precludes a cause of action for violation of the public policy of the Kansas Act Against Discrimination, because the Kansas Act Against Discrimination provides its own adequate remedies. See *Polson v. Davis*, 895 F.2d 705, 709 (10th Cir.1990). The rationale applied in *Polson v. Davis* also applies to

preclude a common law tort for breach of the public policy of the ADA. Thus, to the extent that Plaintiff's claim relies on the public policy of the Kansas Act Against Discrimination or the ADA, the court grants summary judgment.

To the extent that Plaintiff's claim relies on the public policy prohibiting termination in retaliation for whistleblowing, Plaintiff's claim is duplicative of Count VI. This court has concluded that Count VI does not survive summary judgment. Plaintiff has proffered no other public policy on which Count VII relies. Accordingly, the court grants summary judgment as to Count VII, Plaintiff's breach of public policy claim.

### D. Intentional Infliction of Emotional Distress

 In Count VIII of his amended complaint, Plaintiff alleges that Defendants are responsible for intentional infliction of emotional distress. The courts of Kansas have set a high standard for the tort of intentional infliction of emotional distress. See *Glover v. NMC Homecare, Inc.*, 106 F.Supp.2d 1151, 1170 (D.Kan.2000) (citing *Dunegan v. City of Council Grove*, 77 F.Supp.2d 1192, 1208 (D.Kan.1999)). " 'Kansas courts have been reluctant to extend the [intentional infliction of emotional distress] cause of action to discrimination ... claims' ". *Id.* at 1171 (quoting *Bolden v. PRC Inc.*, 43 F.3d 545, 554 (10th Cir.1994)). A plaintiff must prove four elements: (1) conduct in intentional or reckless disregard of the plaintiff; (2) the extreme and outrageous nature of the conduct; (3) a causal connection between the conduct and mental distress experienced by the plaintiff; and (4) the extreme and severe nature of the plaintiff's mental distress. See *id.* "Conduct is not extreme and outrageous unless it is considered as 'being beyond the bounds of decency and utterly intolerable in a civilized society.' " *Id.* (quoting *Penry v. Fed. Home Loan Bank*, 155 F.3d 1257, 1264 (10th Cir.1998) (quoting *Moore v. State Bank*, 240 Kan.

382, 729 P.2d 1205, 1211 (1986))) (internal quotation marks omitted). Furthermore, mere discharge of an employee in and of itself does not rise to the level of extreme or outrageous conduct. See *Gudenkauf v. Stauffer Communications, Inc.*, 922 F.Supp. 461, 464 (D.Kan.1996).

Plaintiff did not address Defendants' arguments regarding his intentional infliction of emotional distress claim in his response to Defendants' summary judgment motion. However, the court has reviewed the record of Defendants' conduct in this case, and concludes that no reasonable jury could find the conduct "beyond the bounds of decency and utterly intolerable in a civilized society." *Glover*, 106 F.Supp.2d at 1171 (citations omitted). Defendants are entitled to summary judgment on Plaintiff's intentional infliction of emotional distress claim (Count VIII).

### E. Tortious Interference with a Business Relationship and Defamation

Plaintiff's final claims in Counts IX and X of his amended complaint involve allegations of tortious interference with a business relationship and defamation. These claims arise out of Plaintiff's attempted employment with the SEC while he lived in Maryland. The court first must determine whether Kansas or Maryland law applies to Plaintiff's claims.

A district court must apply the choice of law rules of the state in which it sits. See *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Because this court sits in the state of Kansas, Kansas choice of law rules apply. Kansas law states that tortious interference claims and defamation claims are governed by the law of the state "where the wrong was felt." See *St. Paul Furniture Mfg. Co. v. Bergman*, 935 F.Supp. 1180, 1187 (D.Kan.1996); *Lawrence–Leiter and Co. v. Paulson*, 963 F.Supp. 1061, 1065 (D.Kan.1997). Plaintiff lived in Maryland when the alleged wrong occurred. Consequently, this court will apply Maryland law when considering Plaintiff's tortious interference and defamation claims.

There are several elements involved in tortious interference and defamation claims in Maryland. This court need not consider the Maryland common law elements of each, because Maryland has a statute which limits the liability of an employer for disclosing information about the job performance of a former employee. Section 5–423 of the Annotated Code of Maryland states:

(a) Liability of employer.—An employer acting in good faith may not be held liable for disclosing any information about the job performance or the reason for termination of employment of an employee or former employee of the employer:

(1) To a prospective employer of the ... former employee at the request of the prospective employer ....

(b) Presumption of good faith; exceptions. An employer who discloses information under subsection (a) of this section shall be presumed to be acting in good faith unless it is shown by clear and convincing evidence that the employer:

(1) Acted with actual malice toward the ... former employee; or

(2) Intentionally or recklessly disclosed false information about the ... former employee.

Md.Code.Ann., Cts. & Jud. Proc., § 5–423. According to this statute, a former employer may not be held responsible for the disclosure of information to a prospective employer unless clear and convincing evidence shows that the former employer acted with actual malice, or intentionally or recklessly disclosed false information. Maryland courts have analyzed what a plaintiff must do in order to establish actual malice:

"Actual malice" cannot be established merely by showing that: the publication was erroneous, derogatory or untrue, the publisher acted out of ill will, hatred

or a desire to injure the official, the publisher acted negligently, ... or the publisher acted without undertaking the investigation that would have been made by a reasonably prudent person.... "Actual malice" can be established by showing that: a defamatory statement was a calculated falsehood or lie "knowingly and deliberately published[;]" ... a defamatory statement was so inherently improbable that only a reckless person would have put it in circulation; or the publisher had obvious reasons to distrust the accuracy of the alleged defamatory statement or the reliability of the source of the statement.

*Chesapeake Publ'g Corp. v. Williams*, 339 Md. 285, 661 A.2d 1169, 1175 (1995). Malice may be established by circumstantial evidence. See *Batson v. Shiflett*, 325 Md. 684, 602 A.2d 1191, 1214 (1992). A plaintiff may establish an inference of malice based on evidence of motive, intent, and negligence. See *id.*

Maryland courts also have provided standards for evaluating whether conduct is reckless: " '[R]eckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication.' " *Hohman v. A.S. Abell Co.*, 44 Md.App. 193, 407 A.2d 794, 798 (1979) (quoting *St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968)).

Finally, when applying Maryland's statute, this court must keep in mind the importance that Maryland courts have placed on the presumption of good faith found in § 5–423 of the Annotated Code of Maryland:

In a world in which employers face almost unsurmountable, and dreadfully costly, hurdles trying to discharge an employee, due to the arsenal of administrative and judicial artillery ... that former employees can bring against them, it is vital that they be allowed the latitude afforded them by Maryland's statutory presumption of good faith in giving and gathering references about prospective employees before hiring them.

*Deutsch v. Chesapeake Ctr.*, 27 F.Supp.2d 642, 645–46 (D.Md.1998).

■ Applying Maryland's standards to the instant case, this court concludes that Plaintiff has not presented clear and convincing evidence of Defendants' malice and/or reckless conduct sufficient to overcome Maryland's presumption of good faith. While Richard Wallman's comment that Plaintiff "sometimes did good work but it was inconsistent" may or may not have been truthful, the court concludes that no reasonable jury could find it "so inherently improbable that only a reckless person would have put it in circulation." *Chesapeake Publ'g Corp.*, 661 A.2d at 1175. Furthermore, while Richard Wallman perhaps should have investigated more before commenting on Plaintiff's performance, Plaintiff has presented no evidence which would tend to show that Richard Wallman "entertained serious doubts as to the truth of his publication." *Hohman*, 407 A.2d at 798.

Richard Wallman also said, "Then I should say no comment," and "What does that tell you?" Plaintiff's attempt to glean maliciousness out of these comments by circumstantial evidence fails. Plaintiff alleges that because Richard Wallman had bonuses dependent upon meeting earnings targets, he had motive to ensure that Plaintiff did not get a job with the SEC, where Plaintiff might be able to initiate an investigation of Defendants. Plaintiff's argument is implausible and based on dubious inferences, and the court concludes that no reasonable jury would make all of the assumptions and inferences Plaintiff asks the court to make.

Plaintiff also reminds the court of his adequate performance evaluations and of the company policy restricting the information released to prospective employers of former employees. Neither of these

represent "clear and convincing" evidence that would infer actual malice or recklessness on the part of Defendants.

Because Plaintiff has failed to present evidence sufficient to overcome the presumption of good faith under Maryland law, the court grants summary judgment with respect to Plaintiff's tortious interference and defamation claims (Counts IX and X).

In sum, the court grants summary judgment as to the following claims: retaliatory discharge under the ADA to the extent Plaintiff requests compensatory damages, punitive damages, and a jury trial; retaliatory discharge for whistleblowing; breach of public policy; intentional infliction of emotional distress; tortious interference with a business relationship; and defamation. The following claims remain for trial: discrimination under the ADA; discrimination under the ADA—disparate impact; discrimination under the Kansas Act Against Discrimination; and retaliation under the Kansas Act Against Discrimination.

IT IS, THEREFORE, BY THE COURT ORDERED that Defendants' summary judgment motion is granted. Judgment is entered in favor of Defendants as to the following claims: retaliatory discharge for whistleblowing (Count VI); breach of public policy (Count VII); intentional infliction of emotional distress (Count VIII); tortious interference with a business relationship (Count IX); and defamation (Count X). Judgment is entered in favor of Defendants as to Plaintiff's claim for retaliation under the ADA (Count II) to the extent it asks for compensatory and punitive damages and a jury trial.

Copies of this order shall be mailed to counsel of record.

**IT IS SO ORDERED.**