# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

Nos. 05-2202/2205

_____

Stephen E. Jones,

          Appellant,

Doyle Clark,

          Appellant,

    v.

United Parcel Service, Inc.; Local 41
of the International Brotherhood of
Teamsters,

          Appellees.

\* Appeals from the United States
\* District Court for the
\* Western District of Missouri.

_____

Submitted: March 13, 2006
Filed: August 22, 2006 **(Corrected 9/19/06)**

_____

Before COLLOTON, HEANEY, and GRUENDER, Circuit Judges.

_____

COLLOTON, Circuit Judge.

Plaintiffs Stephen Jones and Doyle Clark appeal the district court's[1] grant of summary judgment to defendants United Parcel Service ("UPS") and Local 41 of the

_____

[1]The Honorable Gary A. Fenner, United States District Judge for the Western District of Missouri.

International Brotherhood of Teamsters ("Local 41") on their various claims of employment discrimination and breach of the duty of fair representation. We affirm.

## I.

Jones and Clark were employees at a UPS facility in Lenexa, Kansas. Jones was a tractor-trailer driver with a daily route (a "bid route") between Lenexa and Wichita, Kansas. Clark was a package sorter during the morning shift and a hazardous materials ("haz-mat") responder during the day shift. Jones and Clark also were members of Local 41, the union which represented Lenexa facility employees.

In a previous disciplinary action that is not directly at issue in this case, UPS terminated Clark for abandoning his job on September 18, 2002. Clark had arrived early to his shift, and a supervisor invited him to perform overtime work unloading trailers until his package sorter shift began fifteen minutes later. Clark insisted on sorting immediately, and when the supervisor denied Clark's request, he left the facility. Clark returned six hours later with Jones, acting in his union representative capacity, but UPS discharged Clark. Clark filed a grievance that day, and along with union representatives, he met with UPS management. He was reinstated but sanctioned with a two-day suspension.

On October 16, 2002, UPS terminated Clark again. That morning, Clark's supervisors assigned Clark to work as the morning shift haz-mat responder. These duties required Clark to carry and use a two-way radio. One of Clark's supervisors instructed Clark on how to use the radio, but Clark failed to answer any calls despite repeated attempts by supervisors and managers to call him, and he responded to spills only when supervisors approached him in person. Clark's supervisors asked to meet with Clark and union representative Greg Toplikar at the end of Clark's shift. Jeff Johnson, a Lenexa facility morning shift manager, provided Clark with an opportunity to explain why he refused to use the radio, but Clark became unresponsive and

belligerent. Johnson terminated Clark because he refused to follow instructions regarding use of the radio and "was grossly insubordinate in their meeting." (R. Doc. No. 320 at xxvi).

Beginning in late-July 2002, UPS management cut Jones's bid route on twelve or thirteen occasions, and Jones filed grievances regarding many of these cuts. Around the same time, Jones, as union steward acting on behalf of other UPS drivers and on his own behalf, filed several grievances that UPS had routinely used "sleeper teams" to haul loads assigned to Lenexa facility drivers in violation of the collective bargaining agreement. A "sleeper team" is a "two-person crew[] that operate[s] over-the-road tractor trailers," and "take[s] turns driving . . ., thus, keep[ing] the tractor on the road longer than could a single driver." (R. Doc. No. 312 at 39).

UPS terminated Jones on November 12, 2002, for job abandonment. The previous night, Jones had arrived at work to drive his bid route, but Lavell White, a manager, and Scott Wetschensky, a dispatch supervisor, cut Jones's route. They did so because there were insufficient packages to be delivered on Jones's normal route, and because they needed Jones to drive a different route. Jones told Wetschensky that he planned to go home because his route was cut, to which Wetschensky responded that leaving would be considered "job abandonment." Jones expressed to Wetschensky his view that because his route had been cut, leaving would not be job abandonment, and Jones returned home rather than drive the alternative route. UPS management decided to terminate Jones for abandoning his job, and White executed the discharge the next day.

Local 41 business agents file grievances on behalf of UPS employees who believe they have been "disciplined unfairly and in violation of the collective bargaining agreement." (R. Doc. No. 312 at 4). Agents represent union members against UPS at local hearings, during which agents meet with UPS representatives to review the circumstances of the incident leading to the grievance and to discuss

settlement of the dispute. If a local hearing is unsuccessful in resolving a grievance, then the agents continue to represent the union members at the next level of review, before a "Mo-Kan panel." The Mo-Kan panels are composed of an equal number of union and UPS representatives selected by the co-chairs of a Missouri-Kansas Joint Area Grievance Committee ("Mo-Kan Committee") that is created by the collective bargaining agreement to oversee the resolution of grievances. UPS and Local 41 each appoints a co-chair of the Mo-Kan Committee, and these co-chairs select committee members to sit on Mo-Kan panels and hear specific grievances.

Business agent Clint Long filed grievances on behalf of Jones regarding Jones's complaints concerning the cutting of his bid route and the use of sleeper teams, as well as his November 12 termination. At Jones's local grievance hearing regarding his termination, Long requested that Jones be reinstated and presented evidence on Jones's behalf. Agents Toplikar and John Thompson similarly represented Clark in Clark's grievances for his September 18 and October 16 terminations. UPS upheld Jones's November 12 termination and Clark's October 16 termination at their respective local hearings, and Local 41 appealed these decisions to Mo-Kan hearing panels. The Mo-Kan panels upheld UPS's discharges of Jones and Clark. Each plaintiff stated at the end of his Mo-Kan hearing that Local 41 business agents had provided adequate representation.

Jones and Clark then filed this action, alleging that "UPS, with the knowledge, support[,] or at the suggestion of the Union, terminated [them] in violation of the collective bargaining agreement with the Union and for improper []or discriminatory reasons." (R. Doc. No. 28 at 1). According to the complaint, Jones and Clark were politically active in Local 41 and opposed to Local 41's existing leadership. In 2002, Jones became the campaign manager for a slate of candidates that was nominated to run against the incumbents, and Clark ran on the opposition slate's ticket as the nominee for recording secretary. The complaint alleged that Phil Young, who had recently resigned as the Local 41 president, was outraged by the issues and

accusations raised by the opposition slate, and vowed that future candidates would be prevented from raising such accusations. Clark was elected recording secretary on October 15, 2002.

Both plaintiffs raised "hybrid" claims against Local 41 and UPS, pursuant to § 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185, alleging a breach of the union's duty of fair representation and a breach of the collective bargaining agreement by UPS. They also asserted claims against Local 41 under § 101 of the Labor Management Reporting and Disclosure Act ("LMRDA"), 29 U.S.C. § 411, alleging a breach of their statutory rights as union members.

Specifically, Jones alleged that beginning in July 2002, UPS began eliminating his bid route from Lenexa to Wichita at least once per week, and that on November 11, UPS again cut his route and asked him to perform non-emergency alternative work instead. According to the complaint, Jones elected to go home, and although his supervisor made no objection, Jones was summarily terminated the next morning for "job abandonment." Clark alleged that on the morning of October 16, 2002, he was assigned to work as a haz-mat responder. He alleged that he was not provided with a belt clip or other holder for his two-way radio, and that he did not want to put the radio in his pocket for fear of suffering discipline. Clark alleged that UPS supervisors later confronted him for refusing to put the radio in his pocket, and that Clark explained he would not put anything in his pocket that did not belong to him. The complaint alleges that Clark was then immediately terminated for insubordination.

Plaintiffs alleged that after the 2002 union election, Local 41's leadership began "a campaign of retaliation against the [opposition] slate of candidates and Jones." (R. Doc. No. 28 at 23-24). They asserted that the union failed adequately to investigate, pursue, or otherwise process grievances on behalf of Jones and Clark. They further alleged that the Mo-Kan hearing panels summarily upheld their terminations, (*Id.* at

13, 17), and that "the Mo-Kan panel members were appointed or influenced by Union leadership hostile to [plaintiffs], including Phil Young."[2] (*Id*. at 13; *see also id*. at 17).

Alternatively, Jones alleged that UPS terminated him due to his age, in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 623(a)(1), 631(a), the Kansas Age Discrimination in Employment Act, Kan. Stat. Ann. § 44-1111 *et seq.*, and the Missouri Human Rights Act, Mo. Rev. Stat. § 213.010 *et seq.*, or in retaliation for blowing the whistle on alleged UPS record-keeping improprieties. Clark alternatively alleged that UPS terminated him due to age discrimination in violation of the ADEA, or racial discrimination and harassment, in violation of Title VII. 42 U.S.C. § 2000e-2(a)(1).

Local 41 filed a motion for summary judgment, and UPS filed two, one against Jones and one against Clark, and plaintiffs filed a joint response to the three motions, a document that was 480 pages long. According to the district court, "[m]uch of the information contained in [plaintiffs'] mendacious recounting of 'fact' [in their response] is either misstated, inadmissible, or wholly unsupported by the record." The court provided six examples of errors that it believed were rampant throughout plaintiffs' brief, and determined that the brief did not comply with the concision and specificity requirements of Local Rule 56.1. The court stated that the plaintiffs' strategy relied "upon neither the trustworthiness of the factual assertions nor the quality of the arguments, but upon the sheer volume of material impressed upon the opposing parties and the Court." Plaintiffs' brief, in the view of the district court, "represents a form of litigation by attrition, wherein the practitioner's intent was to force the opposition either to yield to its position or be crushed under a great weight of misstated factual assertions and drowned in a sea of bombast." The court ruled that

---

[2]Plaintiffs alleged in their complaint that "as part of [its] campaign of retaliation[,] the Union encouraged and/or pressured UPS into firing Jones and Clark for pretextual reasons." (R. Doc. No. 28 at 23-24). On appeal, they cite no evidence and make no argument in support of this assertion.

both plaintiffs' statement of controverted facts and plaintiffs' response to defendants' uncontroverted facts "are disregarded as noncompliant with the Local Rules and the Federal Rules of Civil procedure and, as a result, all factual assertions by Defendants are deemed as admitted."

Taking each of the defendants' statements of uncontroverted facts as admitted, the court held that plaintiffs could not overcome a motion for summary judgment on their hybrid LMRA § 301 wrongful termination claims. The court thought their arguments alleging Local 41 did not adequately represent them were "incredibly unpersuasive," and "wholly disingenuous," since each plaintiff admitted at his respective Mo-Kan hearing that he was satisfied with the representation provided by Local 41 business agents. Because plaintiffs could not show that Local 41 breached its duties of fair representation, their claims against UPS for breach of the collective bargaining agreement necessarily failed as a matter of law. *See Hines v. Anchor Motor Freight, Inc.*, 424 U.S. 554, 570-71 (1976). The court also held that Clark's hybrid § 301 claim for his September 18 termination was time-barred. *See DelCostello v. Int'l Bhd. of Teamsters*, 462 U.S. 151, 172 (1983) (six-month limitations period). With respect to Jones's hybrid § 301 claims involving UPS cutting his bid route and using sleeper teams to haul his loads, the court concluded that Jones did not establish a triable issue of fact on whether Local 41 breached its duty of fair representation. In addition, the court granted summary judgment to defendants on plaintiffs' various LMRDA claims, for want of evidentiary support and because the LMRDA does not provide a remedy for many of the injuries that plaintiffs asserted.

The court also dismissed the various discrimination clams alleged by the plaintiffs. The court found that neither plaintiff provided sufficient "direct evidence" of age or race discrimination to create a submissible case, *see Griffith v. City of Des Moines*, 387 F.3d 733, 735-36 (8th Cir. 2004), and that plaintiffs also failed to establish a *prima facie* case on those claims, as well as on Jones's whistle-blower

retaliation claim, under the burden-shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973).

II.

We first consider the district court's determination to disregard plaintiffs' statement of controverted facts and responses to defendants' statements of uncontroverted facts contained within their 480-page filing. We review that decision for abuse of discretion. *Northwest Bank & Trust Co. v. First Ill. Nat'l Bank*, 354 F.3d 721, 725 (8th Cir. 2003).

Local Rule 56.1 places size and content limitations on a non-movant's response to a summary judgment motion. W.D. Mo. R. 56.1(a). The rule provides that "[s]uggestions in opposition to a motion for summary judgment shall begin with a section that contains a concise listing of material facts as to which the party contends a genuine issue exists." *Id*. It further directs that "[e]ach fact in dispute shall be set forth in a separate paragraph, shall refer specifically to those portions of the record upon which the opposing party relies, and, if applicable, shall state the paragraph number in movant's listing of facts that is disputed." *Id*. The purpose of the rule is to distill to a manageable volume the matters that must be reviewed by a court undertaking to decide whether a genuine issue of fact exists for trial. It is designed "to prevent a district court from engaging in the proverbial search for a needle in the haystack." *Northwest Bank*, 354 F.3d at 725. With both the movant's list of uncontroverted facts and the non-movant's list controverted facts and accompanying cross-references, including specific citations to the record, the court can focus its review on materials that may demonstrate a disputed issue for trial.

Notwithstanding this rule, plaintiffs filed a 480-page response to the defendants' three motions for summary judgment, which contained 948 statements of "controverted facts" spanning 168 pages, 179 pages of responses to defendants'

statements of uncontroverted facts (included many that were not even disputed), and 132 pages of legal argument. It hardly need be stated that this pleading did not contain a "concise" listing of material facts, as required by Local Rule 56.1(a).

More significantly, plaintiffs' brief suffers from misleading and inaccurate statements, and often omits the citations to the record required by the local rule. The district court correctly listed three examples where the brief materially misstated the record, (R. Doc. No. 373, Pls.' Statement of Controverted Facts, ¶¶ 243, 246, Pls.' Resp. to Local 41's Statement of Uncontroverted Facts, ¶ 90), and we find several more where the record material cited provides inadequate support for the asserted proposition. (R. Doc. No. 373, Pls.' Statement of Controverted Facts, ¶¶ 17, 29, 39, 51, 68, 69, 117, 121).

The district court also correctly cited three examples of plaintiffs' fact statements and responses that contained citation errors. (R. Doc. No. 373, Pls.' Statement of Controverted Facts, ¶ 228, Pls.' Resp. to Local 41's Statement of Uncontroverted Facts, ¶ 79, Pls.' Resp. to UPS's (Clark) Statement of Uncontroverted Facts, ¶ 50). Again, we have found many more. In some statements, the asserted fact was not supported by any citation whatsoever. (R. Doc. No. 373, Pls' Resp. to Local 41's Statement of Uncontroverted Facts, ¶¶ 8, 9, 22, 36, 38, 47, 102, 111, 199, Pls' Resp. to UPS's (Jones) Statement of Uncontroverted Facts, ¶¶ 24, 131). Many other paragraphs simply cross-referenced statements of controverted facts or responses to defendants' uncontroverted facts, in violation of the local rule's requirement that the controverted fact "refer specifically to those portions of the *record* upon which the opposing party relies." (*See* R. Doc. No. 373, Pls.' Resp. to Local 41's Statement of Uncontroverted Facts, ¶¶ 20, 23, 31, 91, 106, Pls.' Resp. to UPS's (Clark) Statement of Uncontroverted Facts, ¶¶ 27, 35, 39, 40, 46, 48, 49, 100-03, 107, Pls.' Resp. to UPS's (Jones) Statement of Uncontroverted Facts, ¶¶ 35, 37, 120-123, 163). In some instances, even the cross-referenced materials are irrelevant to the proposition asserted. Other purported statements of controverted fact instead consist of

impermissible conclusions or legal argument. (R. Doc. No. 373, Pls.' Resp. to Local 41's Statement of Uncontroverted Facts, ¶¶ 119, 121, 122, Pls.' Resp. to UPS's (Clark) Statement of Uncontroverted Facts, ¶¶ 7, 17, 23, 28, Pls.' Resp. to UPS's (Jones) Statement of Uncontroverted Facts, ¶¶ 34, 41, 43, 51, 71, 77, 88).

This case thus presents a scenario similar to that in *Northwest Bank*, where we held that a district court did not abuse its discretion by deeming the movant's statement of material facts admitted as a sanction for the non-movant's failure to comply with analogous Local Rules in the Northern and Southern Districts of Iowa. 354 F.3d at 724-25; *see* N.D. Iowa R. 56.1; S.D. Iowa R. 56.1. In that case, the non-movant's voluminous filings, filled with conclusory allegations and legal argument, did not contain the concision and specificity commanded by the Local Rules. *Northwest Bank*, 354 F.3d at 725; *see also Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 922 (7th Cir. 1994).

We likewise conclude the district court did not abuse its discretion in determining that plaintiffs' statement of controverted facts and response to defendants' uncontroverted facts violated Local Rule 56.1, and in disregarding them as a sanction. As a consequence, the district court properly deemed defendants' statements admitted. "All facts set forth in the statement of the movant shall be deemed admitted for the purposes of summary judgment unless specifically controverted by the opposing party," W.D. Mo. R. 56.1(a), and the plaintiffs failed to provide a pleading in accordance with the rules that controverted any of the movants' facts.

Plaintiffs argue that the district court was required to give specific notice that they violated the local rule before disregarding their response. We believe the local rule itself provides adequate notice of the requirements to which a party must adhere. The district court is not required to study laboriously a 480-page pleading and the record materials cited therein to determine that it is non-compliant with the rules, and

then afford the party another opportunity to file a pleading that complies. This is not a case of a district court nit-picking a party for technical violations of a local rule. The non-compliance was substantial, and it was not an abuse of discretion for the district court to disregard the pleading without further give-and-take with the plaintiffs.

## III.

Having concluded that the district court properly disregarded factual portions of plaintiffs' response, we consider *de novo* the court's determination to grant summary judgment on the remaining record. *See Johnson v. Ready Mixed Concrete Co.*, 424 F.3d 806, 810 (8th Cir. 2005) (standard of review).

## A.

Plaintiffs contend that summary judgment was inappropriate on Jones's age discrimination and whistle-blowing retaliation claims, and on Clark's claims of age and race discrimination. Because we agree with the district court that neither plaintiff has introduced strong evidence showing a specific link between an alleged discriminatory animus and the challenged decisions, plaintiffs' claims are analyzed under the burden-shifting framework set forth in *McDonnell Douglas*. 411 U.S. at 802-04; *see Griffith*, 387 F.3d at 735-36. According to UPS, it "terminated Clark for insubordination and failure to follow instructions." Similarly, UPS "terminated Jones for job abandonment after he refused to work as instructed on November 11, 2002." These are legitimate, non-discriminatory explanations. *See Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1135 (8th Cir. 1999) (en banc); *Putman v. Unity Health Sys.*, 348 F.3d 732, 736 (8th Cir. 2003).

Because UPS fully developed the record for summary judgment, providing legitimate, non-discriminatory, non-retaliatory reasons for terminating plaintiffs, we may turn directly to the ultimate question of whether UPS engaged in intentional

discrimination. *Ready Mixed*, 424 F.3d at 810; *see U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983). Whereas plaintiffs need only make a minimal showing to establish the *prima facie* case, *see Sprenger v. Fed. Home Loan Bank of Des Moines*, 253 F.3d 1106, 1111 (8th Cir. 2001), more substantial evidence of discrimination is required to prove pretext, because evidence of pretext is viewed in the light of UPS's legitimate, non-discriminatory explanation. *Id*. To succeed at this stage of the *McDonnell Douglas* analysis, plaintiffs must prove that the prohibited reason was a determinative factor in UPS's decision to terminate. *Cronquist v. City of Minneapolis*, 237 F.3d 920, 926 (8th Cir. 2001); *see also Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993).

The ADEA prohibits employers from discharging employees on account of age if they are older than forty years, 29 U.S.C. §§ 623(a)(1), 631(a), and Title VII prohibits discrimination on account of race. 42 U.S.C. § 2000e-2(a)(1). Clark, who was in his early 40s at the time of his termination, asserts that his age and race had determinative effect on UPS's decisions to terminate him, but no evidence in the remaining record supports his assertions. Rather, the evidence supports UPS's legitimate, non-discriminatory justification for terminating Clark. Clark initially refused to carry the two-way radio provided by his managers, and he failed to respond to at least six calls. Although Clark asserts that his radio malfunctioned throughout his shift, the record indisputedly supports the conclusion that his radio operated properly. (R. Doc. No. 320 at xxiii-xxiv). Furthermore, Clark was insubordinate when he met with management after completing his shift. The record is devoid of any evidence suggesting that race or age had a determinative effect on UPS's decision to terminate Clark.

Clark also alleges that UPS subjected him to a racially hostile work environment, in violation of Title VII. 42 U.S.C. § 2000e-2(a)(1); *see Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). A plaintiff alleging an unlawfully hostile work environment must show a workplace "permeated with discriminatory

intimidation, ridicule, and insult" that is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris*, 510 U.S. at 21 (internal quotations omitted). To be actionable, the environment must objectively be hostile or abusive, and the employee must subjectively perceive it as such. *Id*. at 21-22. Clark has presented no evidence that he subjectively perceived the Lenexa facility as hostile. The record shows that Clark never filed any grievances about racial harassment while at the Lenexa facility. And there is no evidence of record that UPS personnel made racially derogatory comments in Clark's presence. *See Williams v. ConAgra Poultry Co.*, 378 F.3d 790, 795 (8th Cir. 2004).

Jones, who was in his late 40s at the time he was terminated, argues that age was the but-for cause of his termination, in violation of the ADEA, 29 U.S.C. §§ 623(a)(1), 631(a), the Kansas Age Discrimination in Employment Act, Kan. Stat. Ann. § 44-1110 *et seq.*, and the Missouri Human Rights Act. Mo. Rev. Stat. § 213.010 *et seq*. Age discrimination claims under the MHRA and KADEA proceed under the *McDonnell Douglas* framework when a federal ADEA claim alleged in the same case proceeds in that manner. *Fast v. S. Union Co., Inc.*, 149 F.3d 885, 889 (8th Cir. 1998); *Elza v. Kock Indus., Inc.*, 16 F. Supp. 2d 1334, 1340 (D. Kan. 1998).

Jones argues that UPS's stated reasons for his termination were a pretext for age discrimination. He argues that other feeder drivers committed similar infractions by refusing to drive alternative routes, but were not disciplined, and that this differential treatment supports an inference of age discrimination. There is no evidence, however, that drivers who were assigned to drive an alternative route, and then refused to work, were allowed to pursue that course without discipline. Similarly, Jones alleges that numerous other feeder drivers who engaged in more egregious misconduct had been reinstated, but again, there is no evidence that other drivers were disciplined differently for abandoning their jobs. *See Cherry v. Ritenour Sch. Dist.*, 361 F.3d 474, 479 (8th Cir. 2004).

Finally, Jones alleges that he was the only driver to have his bid route cut more than a couple of times in 2002. That assertion itself implies that the other members of his protected class – all of the company's other drivers over the age of forty – were not treated differently than younger drivers, *see Harris v. Hays*, 452 F.3d 714, 718-19 (8th Cir. 2006), and is consistent with evidence that Lenexa facility drivers were treated the same regardless of age. (R. Doc. No. 321 at xx). The evidence is clear, moreover, that Jones was not similarly situated to most other feeder drivers at the Lenexa facility. His bid route was the last of six hauls driven from Lenexa to Wichita each day, and his route was commonly cut on Fridays for reasons peculiar to his route – volume tended to be lower, and some of the loads that would have been assigned to Jones to haul on Friday evening were not due in Wichita until Sunday or Monday.

Jones's Kansas state law whistleblower retaliation claim also is analyzed under the *McDonnell Douglas* framework. *See Boe v. AlliedSignal, Inc.*, 131 F. Supp. 2d 1197, 1203 (D. Kan. 2001). To allege an actionable whistleblower retaliatory discharge claim in Kansas, the employee must establish that "the alleged irregularities amounted to violations of rules, regulations, or the law pertaining to public health, safety, and the general welfare." *Herman v. W. Fin. Corp.*, 869 P.2d 696, 704 (Kan. 1994) (internal quotations and citations omitted). Even assuming for the sake of argument that retaliatory animus for Jones's report of record-keeping irregularities was a determinative factor in UPS's decision to terminate him, Jones has provided no evidence that these irregularities amounted to violations of public health and safety laws or regulations. In fact, the record evidence is undisputed that the records Jones alleges UPS falsified are maintained exclusively for UPS internal purposes.

B.

Plaintiffs also allege that UPS breached its collective bargaining agreement with Local 41, and that Local 41 breached its duties of fair representation owed to the plaintiffs, in violation of § 301 of the LMRA. They both claim that UPS violated the

contract by terminating them based on age or in retaliation for their union activities, and Clark also alleges that race motivated UPS. They further assert that Local 41 agents inadequately represented plaintiffs in their wrongful termination grievances. Additionally, Jones alleges that Local 41 failed to represent adequately his claims that UPS violated the agreement by routinely cutting his bid route, and by using sleeper teams to haul packages that Jones otherwise would have been responsible to carry.[3]

"Section 301 contemplates suits by and against individual employees as well as between unions and employers," and "encompass[es] those seeking to vindicate 'uniquely personal' rights of employees such as wages, hours, overtime pay, and wrongful discharge." *Hines*, 424 U.S. at 562. As the exclusive bargaining agent in the negotiation and administration of a collective bargaining agreement, the union assumes the responsibility and duty of fair representation for all of its members. *Humphery v. Moore*, 375 U.S. 335, 342 (1964). Section 301 thus permits an action against the union for breach of its duty of fair representation, and an action against the employer for breach of the collective bargaining agreement. A party seeking to recover on a "hybrid" § 301 claim against the employer must prove both that the employer violated the collective bargaining agreement and that the union breached its duty of fair representation, assuming the employee has exhausted his contractual grievance remedies. *Vaca v. Sipes*, 386 U.S. 171, 186-87 (1967); *Waldron v. Boeing Co.*, 388 F.3d 591, 594 (8th Cir. 2004). A union breaches its duty of fair representation only when its conduct toward a member is "arbitrary, discriminatory, or in bad faith," *Vaca*, 386 U.S. at 190; *Buford v. Runyon*, 160 F.3d 1199, 1202 (8th Cir. 1998), or so unreasonable as to be "irrational." *Air Line Pilots Ass'n, Int'l v. O'Neill*, 499 U.S. 65, 78 (1991). "Mere negligence, poor judgment, or ineptitude by a union is insufficient to establish a breach of the duty of fair representation." *Buford*, 160 F.3d at 1202.

---

[3]Clark alleges that Local 41 failed to represent him adequately in his wrongful termination claim arising from his September 18 termination, but the district court correctly concluded this claim was time-barred. *See DelCostello*, 462 U.S. at 172.

-15-

We need not decide whether UPS violated the collective bargaining agreement by terminating Jones or Clark out of a retaliatory or discriminatory motive, because plaintiffs on this record have not provided sufficient evidence to generate genuine issues of fact that Local 41 breached its duties of fair representation. Plaintiffs alleged that Local 41's investigations of each discharge were so inadequate as to "actually taint[] the grievance process." Yet at Clark's Mo-Kan panel hearing, Local 41 business agent Toplikar testified on Clark's behalf that the radio Clark was given did not work properly. Agent Thompson argued that Clark responded to all spills of which he was made aware, and that management "twisted" Clark's responses in his post-shift meeting into insubordination. Clark also testified on his own behalf.

Similarly, agent Long represented Jones at his Mo-Kan hearing after several phone conversations and a thirty-minute meeting between the two the morning of the hearing. Prior to the hearing, Long spoke with three drivers whose testimony Jones considered instrumental to his success, and Long researched a case Jones thought may have had precedential value. Long presented the statement of a driver who had been given the option of going home when his route was cut, and Long stated that Jones had a 28-year career at UPS without a significant disciplinary history. Jones also testified on his own behalf.

Union representatives are not lawyers and are not held to the same standards in presenting cases as attorneys. *Buford*, 160 F.3d at 1203. We have no difficulty concluding that Local 41's representation was not in breach of its duties. Indeed, Jones and Clark each stated to their respective Mo-Kan panels that Local 41 afforded them adequate representation.

Plaintiffs also suggest that UPS management conspired with Local 41 executive board members to retaliate against plaintiffs, that the Local 41 executive board prevented the union's business agents from fully performing their jobs, and that the Mo-Kan panel predetermined Jones's case and failed to give him a proper hearing.

They cite the temporal proximity between the terminations and Clark's election as recording secretary on the slate opposing Local 41's incumbent president, their long records of service to UPS spanning over twenty years, and what they view as terminations for relatively minor misconduct. Clark, of course, had been disciplined once before for job abandonment, so it is difficult to view his second infraction as anything approaching *de minimis*.

In any event, what is missing from the record – disregarding the plaintiffs' non-compliant response to the motions for summary judgment – is any evidence that Local 41 did anything "arbitrary" or "irrational," or conspired with UPS in executing an alleged retaliatory scheme. Under the LMRA, plaintiffs are obliged to establish *both* that UPS retaliated and that Local 41 breached its duties of fair representation. *See Vaca*, 386 U.S. at 186-87. There is insufficient evidence to show that the business agents performed inadequately in representing Jones and Clark. The union membership on the Mo-Kan panel was drawn from Teamsters units other than Local 41, (R. Doc. No. 312 at 19, 32), and there is no evidence of record that the Mo-Kan members were influenced by the leadership of Local 41 to retaliate against Jones and Clark, or that the Mo-Kan panel members otherwise carried out their duties in bad faith. The mere fact that the leadership of Local 41 was opposed to Clark in a union election is insufficient to support an inference that Mo-Kan panel members, drawn from different Teamsters units, acted in bad faith when considering the company's disciplinary action against Jones and Clark.

Jones's claims concerning elimination of his bid route and the use of sleeper teams similarly suffer from a lack of record support. Jones argues that Local 41 failed to investigate, postponed presenting the grievances to the Mo-Kan panel, and erred by not consolidating these grievances with his termination grievance. At the local hearing for Jones's first bid route elimination grievance, however, Long negotiated with UPS management to have Jones drive empty trailers from Wichita to Lenexa, and Jones agreed that this was a satisfactory settlement. Jones's grievances for subsequent

cuts could not be resolved locally, and Long prepared to argue Jones's grievances before the Mo-Kan panel. Neither Long nor Jones could find any evidence that Jones's regular route was handled by drivers with less seniority, in violation of the collective bargaining agreement, and Long postponed presenting Jones's case in the hopes of discovering such evidence. Long withdrew the grievances in January 2003, because he had not discovered the evidence he sought, and because the Mo-Kan panel had already upheld Jones's November 12 termination. An individual employee does not have an absolute right to have his grievance taken to arbitration, *see Vaca*, 386 U.S. at 191, and Long's decisions about the handling of these grievances do not support a claim that Local 41 breached its duty of fair representation.

Similarly, no evidence supports Jones's assertion that Local 41 acted in an arbitrary or discriminatory manner in pursuing his sleeper team grievances. Pursuant to the collective bargaining agreement, a joint committee comprised of Teamster and UPS representatives approves the use of sleeper team routes, including the route that was the subject of Jones's complaints. Jones does not argue that the joint committee approved a particular sleeper team route in violation of the collective bargaining agreement, but rather that UPS violated the agreement by using an approved team to haul packages that Jones otherwise would have been responsible to haul. Long presented Jones's grievance to the Mo-Kan panel, and was told at the hearing that the joint committee overseeing sleeper teams had jurisdiction to resolve the dispute. A UPS panel member also explained that if sleeper teams did not haul the cargo in question, then it would be hauled by train, not by Jones. In light of this information, and because the joint committee already had approved the sleeper team route, Long decided not to docket Jones's sleeper team grievances with the joint committee overseeing sleeper teams. Long's decision does not support a claim that Local 41 breached its duty of fair representation.

C.

Finally, plaintiffs allege a variety of breaches by Local 41 of the LMRDA. Title I of the LMRDA, the union workers' "Bill of Rights," protects the rights of union members to vote and participate in union decisions, insulated from improper disciplinary action. 29 U.S.C. § 411(a); *Bradley v. Am. Postal Workers Union, AFL-CIO*, 962 F.2d 800, 801 (8th Cir. 1992); *see also Wirtz v. Hotel, Motel & Club Employees Union, Local 6*, 391 U.S. 492, 497-98 (1968).

Plaintiffs claim that Local 41 deliberately undermined their grievances challenging the terminations. The district court was correct to conclude that these claims essentially contain the substance of plaintiffs' § 301 claims against Local 41. Because plaintiffs were unable to establish that Local 41 breached its duties of fair representation, the claims involving that representation raised under § 101 of the LMRDA also fail.[4] Plaintiffs also allege that Local 41 violated the LMRDA by failing to find them alternative employment so that they could retain their union membership. They point to nothing in the text of the LMRDA or any case law, however, supporting the proposition that Local 41 had an affirmative duty under the statute to assist plaintiffs in securing new employment so that they could maintain their union membership.

Clark further alleges that Local 41 violated the LMRDA by trying to expel him for failing to pay dues. The LMRDA, however, clearly contemplates that a union may fine, suspend, expel, or otherwise discipline a member for nonpayment of dues. 29 U.S.C. § 411(a)(5). Moreover, an LMRDA claim is only actionable when the member

---

[4]Clark's claim that Local 41 inadequately represented him in his grievance over his September 18 termination, although time-barred for § 301 purposes, was timely filed for LMRDA purposes. *See Marshall v. Local Union No. 6, Brewers & Maltsters & Gen. Labor Dep'ts*, 960 F.2d 1360, 1367 (8th Cir. 1992). Nevertheless, the record evidence is insufficient for Clark to overcome a motion for summary judgment.

demonstrates a direct interference with his vested rights, *see Franza v. Int'l Bhd. of Teamsters, Local 671*, 869 F.2d 41, 47 (2d Cir. 1989), and Local 41 did not actually discipline Clark for failing to pay dues, but merely threatened to take action, thereby providing Clark with incentive to satisfy his financial obligation.

Clark's other claim under the LMRDA is that Local 41 maliciously prosecuted him before the Teamsters joint resolution panel, and that he was injured because the joint council refused to dismiss charges of misuse of union funds and nonparticipation in union events prior to holding a hearing. As with his payment-of-dues claim, Clark has not alleged any direct interference with vested rights, because he was not disciplined. The responsibility to defend oneself at a hearing is not tantamount to discipline.

\*     \*     \*

For the foregoing reasons, the judgment of the district court is affirmed.

HEANEY, Circuit Judge, concurring in part and dissenting in part.

I agree with the majority that the district court was within its discretion to impose sanctions for the plaintiffs' failure to comply with local rules of procedure, and further agree that the district court properly granted summary judgment on the race discrimination, age discrimination, and whistleblower claims. In my view, however, the plaintiffs presented sufficient evidence to create a jury question on the issue of whether they were terminated in retaliation for their union activities. Accordingly, I dissent from the portion of the majority's opinion affirming the grant of summary judgment in favor of the defendants on these claims.[5]

---

[5]Both the district court and the majority declined to reach the issue of whether UPS violated the collective bargaining agreement, because they found no breach of the union's duty of fair representation, a necessary precondition to prevailing on a

The uncontroverted facts presented to the district court were as follows: Both Stephen Jones and Doyle Clark were long-time employees of UPS, enjoying tenures of roughly twenty-eight and twenty-three years, respectively. Jones had never experienced significant disciplinary problems; Clark had been fired and reinstated once in 1997. It was not until Jones and Clark embroiled themselves in a contested union election that either faced further discipline.

Jones and Clark were vocally critical of the union administration and actively campaigned for opposition candidates. Clark, in fact, campaigned for and was elected to the position of recording secretary. The timing of critical events with regard to their political activities and their discipline clearly raises an inference that Jones and Clark suffered adverse employment effects as a consequence of their opposition to the incumbent union administration. Clark was nominated as a candidate for the position of recording secretary on September 14, 2002; four days later, he was suspended two days for job abandonment.[6] On October 15, 2002, the union election was held, and Clark was elected recording secretary. He was fired the next day. Less than a month later, Jones, who actively campaigned for the opposition slate of candidates, was fired. In his prior twenty-eight years of service, Jones presented no meaningful disciplinary concerns.

Moreover, the reasons given for terminating each employee were suspect. Clark was fired for "insubordination towards management" relating to his assignment as a haz-mat responder. (Local 41 App. at 11.) Specifically, he committed the offenses of not using his two-way radio during a shift, and acting insubordinately during a meeting with his supervisor regarding the two-way radio. Although

hybrid § 301 claim. Hines v. Anchor Motor Freight, Inc., 424 U.S. 554, 570-71 (1976). Accordingly, I focus my dissent on this point of disagreement.

[6]Clark was initially fired, but was able to reach a resolution with UPS whereby he was reinstated after a two-day suspension.

management characterized the failure to carry the two-way radio as a serious offense that endangered Clark's fellow employees, Clark was not disciplined until his shift was over. The insubordination charge was based primarily on an exchange in which Clark's supervisor repeatedly asked if Clark carried the radio in his pocket, and Clark repeatedly answered that he did not put things that did not belong to him in his pockets. For this, UPS ended Clark's twenty-three year career with the company.

Jones was fired after a dispute regarding his route as a driver. He typically drove a route from Lenexa to Wichita, Kansas. In the months prior to his termination, Jones's Wichita route was increasingly cut. When that happened, he was usually given the option of driving another route or going home. When his route was cut on November 11, 2002, however, Jones was asked to drive another route. Instead, Jones opted to go home–an option indisputably open in the past. His view was that this was not job abandonment because his job was to drive the Wichita route, and it was not available. In other words, his job was cut, so there was no job for him to abandon. Jones's supervisor claimed to have disagreed with this interpretation, but he assisted Jones with clocking out when the electronic time clock gave him trouble. The supervisor did not call a manager or union steward to resolve the conflicting interpretation, and Jones was allowed to leave without incident or warning of potential future discipline. The next day, when Jones arrived at work, he was informed that UPS disagreed with his interpretation of what constituted job abandonment. As discipline, the company terminated a person who had given it nearly thirty years of service.

From this evidence, one could certainly conclude that Jones's and Clark's terminations were not wholly justified, but were rather the products of collusion between UPS and local union members to remove Jones and Clark for their union-based political activities. Evidence of their political activity or the split factions

within Local 41, however, was never adequately presented to the Mo-Kan panel.[7] In fact, it was not addressed at all by either the company or the union's business agents.[8] The business agents' failure in this regard qualifies as perfunctory treatment that, when considered contextually, supports the inference that bad faith motivated the union's representation of Jones and Clark. See Vaca v. Sipes, 386 U.S. 171, 177, 194 (1967) (holding that bad faith conduct or the processing of a grievance in a perfunctory manner breaches the union's duty of fair representation). Thus, I respectfully dissent from that portion of the majority opinion affirming the district court's holding that Jones and Clark failed to make a case that they were dismissed in retaliation for their union activities.

———————————————————

[7]The Mo-Kan panel is the appellate body for grievances such as those in this case. That panel is made up of six members: three from the company and three from the union. An aggrieved employee is bound by the decision of the Mo-Kan panel unless it deadlocks. I question whether this structure truly affords the aggrieved party a fair review of their dispute, for the panel is comprised of people with an interest in the outcome of each case. I recognize that often the decisionmaker's interest may be attenuated because union panel members are chosen from different local unions than the aggrieved employee, but still believe this panel is no substitute for a truly independent body. See Gen. Drivers Union, Local 554 v. Young & Hay Transp. Co., 522 F.2d 562, 567 n.5 (8th Cir. 1975) (Heaney, J.) (noting, for the court, "serious reservations" with regard to the Teamsters' joint grievance committee composition because "[t]he opportunities for discrimination against the dissident employee with a legitimate grievance or the small employer in competition with those who help control the joint panel are too real to be ignored"). Although the Supreme Court and our court have equated this procedure to arbitration, Hines v. Anchor Motor Freight, Inc., 424 U.S. 554, 557 n.2, 562-64 (1976); Tongay v. Kroger Co., 860 F.2d 298, 300 (8th Cir. 1988), I continue to harbor my own doubts.

[8]Each employee was permitted to present any evidence they wished at the Mo-Kan hearing, and each stated they were satisfied with the union's representation. Certainly, this evidence weighs in favor of the union's position that it fairly represented Jones and Clark. It is not dispositive, however, given the evidence summarized above regarding how closely the employees' terminations coincided temporally with their activities in opposition to the union leadership.